764 A.2d 475 (2001)
MANORCARE HEALTH SERVICES, INC., Plaintiff-Appellant,
v.
OSMOSE WOOD PRESERVING, INC., Defendant-Respondent, and
Hoover Treated Wood Products, Inc., Wood Treating Corporation of Philadelphia, The Bennett Lumber Company d/b/a V.G. Bennett Lumber Co. or Volney G. Bennett Lumber Company, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued December 11, 2000.
Decided January 11, 2001.
*476 Stephen R. Mysliwiec (Piper Marbury Rudnick & Wolfe) of the Washington, D.C. bar, admitted pro hac vice, argued the cause for appellant (Piper Marbury Rudnick & Wolfe, attorneys Mr. Mysliwiec and Keith E. Smith, on the brief).
T. Gregory Slother of the State of Florida bar, admitted pro hac vice, argued the cause for respondent (Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, attorneys respondent) (Mr. Slother and Richard J. Hull, of counsel, and Heidi P. Rubin Cohen and Mr. Hull, on the brief).
Before Judges PETRELLA, NEWMAN, and WELLS.
The opinion of the court was delivered by NEWMAN, J.A.D.
In this spoliation of evidence case, we address the issue of appropriate sanctions in a case involving fire retardant treated (FRT) plywood, where the manufacturer was afforded an opportunity to inspect the damaged plywood and did so, but was denied notice of the removal and replacement of the damaged plywood and thereby lost the ability to monitor the removal and replacement phase. We conclude that the appropriate sanction would have been to bar at trial the admissibility of evidence obtained during the removal and replacement stages, but nonetheless allow the case to proceed forward instead of dismissing the complaint.
Plaintiff ManorCare Health Services, Inc. ("ManorCare") appeals from a summary judgment dismissing its complaint against defendant Osmose Wood Preserving, Inc. ("Osmose"), based upon ManorCare's failure to provide Osmose with timely notice as to precisely when roof repairs at ManorCare's Medbridge Medical and Physical Rehabilitation Facility ("Medbridge facility") would be taking place. This failure to provide notice precluded *477 Osmose from having its representatives present during the repairs. Osmose, the sole remaining defendant in this case, was granted summary judgment as to ManorCare's remaining claims of common law fraud and violations of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-2. The trial judge also awarded Osmose $10,000 in counsel fees incurred in its motion for summary judgment. We now reverse.
The facts are relatively straight forward. The allegedly defective FRT plywood roof sheathing involved in this case was manufactured by two companies: defendant Osmose and defendant Hoover Treated Wood Products, Inc. ("Hoover"). By letters dated December 22, 1994 and January 4, 1995, James A. MacCutcheon, Senior Vice President of ManorCare, attempted to place Hoover and Osmose, respectively, on notice "that there has been significant degradation of the plywood roof sheathing at" ManorCare's Medbridge facility. MacCutcheon demanded in each letter that the recipient take all steps necessary at its cost and expense to replace the degraded roof sheathing. He also indicated that ManorCare would proceed with the necessary repairs and replacements and hold the recipients fully responsible for such costs if no written response agreeing to effectuate the repairs was received by ManorCare within seven business days.
By letter dated January 10, 1995, T. Gregory Slother, counsel for Osmose, responded to ManorCare's letter and requested information and documentation concerning the facility. Slother concluded the letter as follows:
Finally, I note that your correspondence mentions the possibility of your company proceeding without further delay to perform repairs. On behalf of Osmose, as set forth above, we are willing to discuss this matter with you if the above conditions are met. Nonetheless, I do need to advise you that Osmose must insist on being notified of any repair or replacement and being granted the opportunity to inspect and witness such repair or replacement. If your company is unwilling to do this and proceeds with repairs, Osmose will be forced to take the position that this constituted a destruction of evidence. Hopefully, however, we will be able to proceed as outlined above and avoid any such problems....

[Emphasis added.]
By letter dated February 21, 1995, Stephen R. Mysliwiec, counsel for ManorCare, responded to the Slother letter, providing information and documentation requested by Osmose. Mysliwiec's letter included the following paragraph:
Manor HealthCare is happy to arrange a time for you and/or Mr. Wangle to inspect and examine the above-referenced facility. The company would also like to engage in discussions with you to attempt to settle the company's claim against Osmose. In addition, the company will notify you prior to the repair of the roof at the facility so that you may comment on the intended repairs in advance and observe the repairs being made.

[Emphasis added.]
Also by letter dated February 21, 1995, Mysliwiec requested that counsel for Hoover respond to the demands made in MacCutcheon's December 22, 1994 letter. Mysliwiec's letter to Hoover explained that "[t]he roof at the above-referenced facility is scheduled to be replaced in the next several weeks. Please contact me if [Hoover] would like to inspect the roof at this facility prior to or at the time of the repair."
By letter dated March 8, 1995, Mysliwiec explained to Slother that Slother and/or Robert K. Wangel, Manager of Architectural Engineering at Osmose, could inspect the Medbridge Facility on March 27, 1995. Mysliwiec proposed that the parties then meet the following day in Piper & Marbury's Washington, D.C. office to discuss resolution of ManorCare's *478 claim. Slother replied by letter dated March 13, 1995, confirming the meeting on March 27, 1995 and the follow-up meeting in Washington, D.C. on March 28, 1995.
The inspection took place on March 27, 1995. Slother and Wangel appeared on behalf of Osmose, and their visit was memorialized in a seven-page inspection report prepared by Wangel. Wangel's report stated that Larry Godla, Vice President of Construction, and Edward A. Kubis, Assistant General Counsel of ManorCare, accompanied them during the inspection. The report summarized Wangel's observations and referenced thirty-seven photographs apparently taken by Wangel, under four headings corresponding to distinct areas of the Medbridge facility attic: the West Wing, the Second Floor Main Roof Structure, the East Side of main attic area, and the Residential Wing. Wangel noted:
All parties present agreed that there was approximately 50% Osmose brand fire retardant treated plywood product located in the far West wing (½ of the wing was Osmose brand plywood, the other half was [Hoover] Protex). There was approximately 5% (generous) Osmose brand fire retardant treated plywood in the attic over the resident's section of the roof's structure.
Wangel's report recounted that he had urged both Godla and Kubis to accompany Slother and him to the proposed meeting with Mysliwiec in Washington, D.C. the following day. However, because neither Godla nor Kubis were able to attend, Wangel and Slother agreed to postpone such a meeting until an undetermined future date.
On the following day, March 28, 1995, Mysliwiec sent a letter to counsel for Hoover, indicating that the Osmose's representatives had inspected the Medbridge facility's roof, wherein they observed "that most of the FRT plywood was manufactured by" Hoover. Mysliwiec also stated that "the repairs are scheduled to take place by sometime next week, depending on the weather." No correspondence was sent from Mysliwiec or any ManorCare representative to Osmose indicating when the repairs would likely commence.
By letter dated April 4, 1995, Mysliwiec informed counsel for Hoover that counsel and/or an inspector on behalf of Hoover were scheduled to inspect the Medbridge facility's attic and roof on April 6, 1995. Mysliwiec explained that "[i]t is unlikely that the inspection would take more than a half day. The inspection by the Osmose inspector and Osmose's attorney took approximately 2.5 hours." ManorCare ultimately settled its claims against Hoover.
According to deposition testimony of Charles M. Albert, whose bid for the entire roof replacement was accepted by ManorCare, the roof repairs had been approved by February 21, 1995. Albert testified that he did not believe that anyone from ManorCare ever instructed him to notify representatives of Osmose prior to commencement of the roof repairs.
Osmose's initial written notice that the roof repairs were already underway came by letter from Mysliwiec dated September 22, 1995. In this letter, Mysliwiec stated that the roof repairs, "which [he] thought were further along, are just now being completed." By letter dated October 4, 1995, Mysliwiec advised Slother that sample panels of the FRT plywood taken from the Medbridge facility's roof during the repairs were being "stored at a site near [ManorCare's] corporate headquarters in Silver Spring, Maryland," and that Osmose's inspector should contact Albert to make arrangements to inspect them. The record reveals no prior correspondence from Mysliwiec or any ManorCare representative to Slother or any Osmose representative indicating precisely which day the repair work was to begin, the time-frame during which the work would proceed, or advising Osmose that it could comment on the proposed repairs and have its inspectors present during such repairs, as originally agreed to by Mysliwiec.
*479 The Agans/White Group oversaw the plywood repair at the Medbridge facility, counted each piece of plywood removed, and prepared a report dated October 5, 1995 documenting the repairs, along with a three hour video tape of the repairs. Prior to the commencement of roof repairs, Agans/White Group had issued a Roof Evaluation report, which included color photographs of exterior and interior portions of the roof structure. Mysliwiec wrote to Slother on October 12, 1995 and indicated that "of the 1808 full and partial panels of defective FRT plywood that were replaced, 905 were Hoover Protex, 665 were treated with Osmose Flame Proof... and 238 panels of FRT plywood could not be identified because the stamps were illegible or the panel was a partial one which did not contain stamps." Based upon these figures, Mysliwiec stated that forty-two percent of the plywood removed from the roof was treated by Osmose treater.
In an affidavit dated October 15, 1998, Thomas F. White, the president of Agans/ White Group, stated that "[o]f the panels that were removed and saved, ten were full 8 foot by 4 foot panels of Osmose FRT plywood that contained the Osmose stamp." White further maintained that these sample panels were
taken from diverse locations on the facility's roof.... Agans/White did not attempt to take samples of only those panels that appeared to be the most brittle or the most discolored. Rather, we took samples that were representative of the condition of the Osmose FRT plywood throughout the roof....
The other panels of the FRT plywood that were removed from the Medbridge facility's roof were discarded in the ordinary course.
A.L. DeBonis, Ph.D., President of Wood Advisory Services, Inc., issued a report dated September 21, 1998, which set forth his opinions as to the plywood samples taken from the Medbridge facility.

I.
"`Spoliation of evidence in a prospective civil action occurs when evidence pertinent to the action is destroyed, thereby interfering with the action's proper administration and disposition.'" Aetna Life and Cas. Co. v. Imet Mason Contractors, 309 N.J.Super. 358, 364, 707 A.2d 180 (App.Div.1998) (quoting Hirsch v. General Motors Corp., 266 N.J.Super. 222, 234, 628 A.2d 1108 (Law Div.1993)). In Aetna, we agreed with the Hirsch court's analysis that a duty to preserve evidence is a question of law to be determined by the court, and that such a duty, independent from a court order to preserve evidence, arises when there is:
(1) pending or probable litigation involving the defendants; (2) knowledge by the plaintiff of the existence or likelihood of litigation; (3) foreseeability of harm to the defendants, or in other words, discarding the evidence would be prejudicial to defendants; and (4) evidence relevant to the litigation.
[Aetna, supra, 309 N.J.Super. at 366-67, 707 A.2d 180.]
"`The spoliator's level of intent, whether negligent or intentional, does not affect the spoliator's liability. Rather, it is a factor to be considered when determining the appropriate remedy for the spoliation.'" Id. at 368, 707 A.2d 180 (quoting Hirsch, supra, 266 N.J.Super. at 256, 628 A.2d 1108).
On appeal, ManorCare argues that "the evidence was strong that Osmose received notice that the West Deptford facility's roof was about to be repaired," and "even if Osmose did not receive prior notice of the repairs, the evidence is not sufficient to support a finding that ManorCare spoliated evidence." ManorCare asserts to find that ManorCare spoliated evidence, the trial judge was first required to "find that ManorCare intentionally failed to give notice of the repairs or intentionally destroyed evidence." This assertion is at odds with this court's analysis in Aetna, supra, 309 N.J.Super. at 368, 707 A.2d 180, *480 wherein we specifically explained that the spoliator's liability exists regardless of whether spoliation occurred through intentional or negligent conduct.
ManorCare further claims that Osmose did "in fact conduct a detailed inspection of the roof" prior to the repairs. ManorCare enumerates all of the information, reports, and deposition testimony Osmose obtained pertaining to the Medbridge facility's roof. ManorCare argues that there is no evidence "that Osmose ever intended to take its own samples from the roof," and points to Osmose's apparent lack of surprise upon being informed for the first time when the repair work was near completion. ManorCare refers to the impartiality of the Agans/White Group, which it employed to supervise and document the roof repairs and collect sample pieces of plywood, a task it maintains was "purely ministerial in nature." Thus, ManorCare concludes that "Osmose was not prejudiced by any failure by ManorCare to notify Osmose of the repairs."
We disagree. The fact of the matter is that in Mysliwiec's February 21, 1995 letter to Osmose's counsel, Mysliwiec agreed to "notify you prior to the repair of the roof at the facility so that you may comment on the intended repairs in advance and observe the repairs being made." For whatever reason, Mysliwiec and ManorCare failed to do so. As a direct result, Osmose was unable, as Mysliwiec put it, to "comment on the intended repairs in advance and observe the repairs being made."
ManorCare cannot now be heard to contend that no prejudice resulted from its foreclosing this option, whether intentionally or inadvertently. As the trial judge explained:
Because not having the benefit of its own independent testing of the materials, from the Medbridge facility, and in not having the opportunity to view the roof environment, Osmose has lost the ability to obtain proofs that the FRT plywood, used in Medbridge, had performed properly. And that any strength, loss, or deterioration found was the result of "construction defects," or adverse conditions in the roof environment, related to poor design and/or construction.
The trial judge had this to say concerning the preservation of evidence and notice to Osmose:
It's particularly important in FRT plywood because of the manner in which it was said the wood deteriorates. It deteriorates because of heat and moisture that cumulates in the lofts or ceilings-above the ceilings. The excess heat and humidity that's up there sometimes is due to other conditions which are noted in the reports involved in this case. Potential sockets that were not blocked, not enough air circulation, improper flashing, improper ventilation, and other things that were noted in the reports.
These are all items that an inspection at the time or prior to the time of the removal of the roof might have been detected and observed by Osmose to help itself defend the claim that its roof wasthat its product was either in whole or in part responsible for the damages claimed by Manor Care. It's not only important for exculpation if there is such a word, but at least to mitigate some of the damages that might have beenmight be assessed against it.
The trial court noted that ManorCare's nonfeasance effectively "put[ ] Osmose in the position that it has to rely on the authenticity ... of plaintiff's witnesses and plaintiff's evidence."
ManorCare attempts to distinguish this court's decision in Aetna, supra, on the basis that in this case Osmose was afforded an opportunity to inspect the roof before the repairs took place. Aetna involved a 1986 Ford Econoline van that caught fire in 1993 and damaged three nearby condominium units. Aetna, 309 *481 N.J.Super. at 361, 707 A.2d 180. An officer from the Whippany Fire Department was unable to ascertain the exact cause of the fire due to extensive fire damage. Ibid. State Farm Insurance Company, the insurer of the van, retained a firm to ascertain the cause of the fire, which issued several reports opining that the cause of the fire was a fuel line failure. Id. at 362, 707 A.2d 180. Aetna Life and Casualty Company, which had paid almost $100,000 to repair the damaged condominium units, also employed a firm to conduct an investigation as to the cause of the fire in the van, which generated a report dated December 13, 1994. Ibid.
Defendant Ford Motor maintained that Aetna did not put it on notice regarding this claim until October 6, 1994. Ibid. By letter dated October 26, 1994, Ford requested that Aetna "take all necessary steps in order to ensure that the subject vehicle and all of its component parts are maintained and preserved for trial." Id. at 364, 707 A.2d 180. However, the van was ultimately destroyed before Ford was given an opportunity to inspect it. Ibid. Simon Motors, a co-defendant that had re-built the van's engine seventeen months prior to the fire and in doing so had worked on the van's fuel system, claimed that it was not notified of the fire until Aetna, as subrogee of Baker Companies, Inc., filed suit on May 25, 1995. Ibid. Simon Motors also did not have an opportunity to inspect the van prior to its destruction. Ibid.
Following the rationale enunciated in the Hirsch decision, supra, which involved very similar factual circumstances, we found that "Aetna had a duty to preserve the van and they ... breached that duty by not preserving the van for inspection by defendants, thereby substantially and irreparably interfering with the discovery process." Id. at 368, 707 A.2d 180. We explained that the reports Aetna obtained made it "reasonable to conclude, as the court did in Hirsch, that Aetna knew of the likelihood of subsequent litigation. Additionally, it was foreseeable that disposal of the van would be prejudicial to defendants." Id. at 367, 707 A.2d 180. As a result of Aetna's destruction of the van, "defendants were denied the opportunity to inspect the van and determine the validity and viability of the reports prepared by" Aetna's experts. Ibid. We emphasized that "the van `is central, and thus relevant and material, to this litigation. It is the best evidence to ... ensure that the results will be accurate.'" Id. at 368, 707 A.2d 180 (quoting Hirsch, supra, 266 N.J.Super. at 251, 628 A.2d 1108). We agreed with the trial court that prejudice to defendants was apparent, reasoning as follows:
From Ford Motor's perspective, the loss from the inability to inspect was irretrievable. The van had traveled 137,000 miles and the engine was rebuilt seventeen months before the fire. Under these circumstances, the need for actual examination was essential. Photographs of the engine would not be an adequate substitute for personal observation of the intricate parts of an automobile engine. This is no less true for Simon Motors, who did not even learn of the fire until it was served with plaintiff's complaint. Visual observation of the fire damage was critical in order to assess whether its work in rebuilding the engine could have led to any risk of fire.

[Id. at 368-69, 707 A.2d 180.]
Although we were "originally inclined" to simply preclude the expert reports prepared for Aetna and bar expert testimony as to the inspections of the van, Aetna's counsel represented that he had no proofs, absent expert testimony. Id. at 369, 707 A.2d 180. Therefore, we saw "no point in ordering a futile remand," although we were quick to instruct that "in future cases... the ultimate sanction of dismissal should be a remedy of last resort." Ibid.
Although this case is factually distinguishable from Aetna in that Osmose did conduct an initial inspection of the roof prior to the repairs, here, as in Aetna, "the *482 need for actual examination was essential." There was simply no excuse for ManorCare's failure to inform Osmose in advance as to which day the repairs would commence. As in Aetna, photographs of the roof, videotape, testimony, and reports prepared by firms and workers employed by ManorCare are a far cry from personal observation by Osmose's experts during the removal and repair work. Prejudice to Osmose is apparent.
We now examine whether any sanction short of dismissal of ManorCare's complaint could have eradicated this prejudice.

II.
Trial courts have the "inherent discretionary power to impose sanctions for failure to make discovery." Aetna, supra, 309 N.J.Super. at 365, 707 A.2d 180 (quoting Hirsch, supra, 266 N.J.Super. at 260, 628 A.2d 1108). This court will not disturb such sanctions "if they are just and reasonable under the circumstances." Ibid. (quoting Hirsch, supra, 266 N.J.Super. at 261, 628 A.2d 1108). Dismissal with prejudice, the ultimate sanction, should only be ordered "`when no lesser sanction will suffice to erase the prejudice suffered by the non-delinquent party.'" Ibid. (quoting Hirsch, supra, 266 N.J.Super. at 261, 628 A.2d 1108 (quoting Johnson v. Mountainside Hosp., Respiratory Disease Assocs., 199 N.J.Super. 114, 119, 488 A.2d 1029 (App.Div.1985), certif. denied, 122 N.J. 188, 584 A.2d 248 (1990))). "`If a lesser sanction could erase the prejudice against the non-delinquent party, dismissal of the complaint with prejudice would not be appropriate and would therefore constitute an abuse of discretion.'" Ibid. (quoting Johnson, supra, 199 N.J.Super. at 119, 488 A.2d 1029).
In this case, therefore, the issue narrows to whether any sanction short of dismissal could erase the prejudice to Osmose. We now turn to analyze two possible sanctions less drastic than dismissal. First, whether an adverse "spoiliation inference" jury instruction based upon ManorCare's failure to inform Osmose would suffice to alleviate the prejudice suffered by Osmose. Second, assuming that such an instruction would not suffice, whether rendering all reports, photographs, videos, and samples taken during and after the roof renovation inadmissible, but still allowing the case to proceed against Osmose based solely upon the findings, observations, and photographs taken by both sides prior to the roof repairs, would be an adequate sanction for ManorCare's dereliction and effectively dilute the prejudice to Osmose.
ManorCare argues in favor of the first option. ManorCare cites the Third Circuit's decision in Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 78 (3d Cir. 1994), where the Court announced:
[T]he key considerations in determining whether [dismissal] is appropriate should be: (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.
In this regard, ManorCare maintains that an adverse inference jury instruction would suffice to "level the playing field," since it "did not intend to destroy evidence and in fact took pains to preserve evidence for Osmose's inspection and review." Thus, argues ManorCare, a jury instruction explaining that the jury "may conclude that the lost evidence would have been unfavorable to the plaintiffs" should cure any prejudice to Osmose. ManorCare contends that "the exclusion of evidence is not a necessary remedy to `level the playing field.' Rather, a spoliation inference would be more than adequate under the facts of this case."
ManorCare relies upon Howell v. Maytag, 168 F.R.D. 502 (M.D.Pa.1996), and Baliotis v. McNeil, 870 F.Supp. 1285 *483 (M.D.Pa.1994). In each of these cases, the District Court held that an adverse "spoliation inference" jury instruction was a sufficient and appropriate sanction to compensate for the destruction of evidence. Almost factually identical, both of these cases involved a fire to a residential home allegedly caused by a microwave oven, where the microwave oven was ultimately saved, along with related electrical wiring, but the house was demolished before defendant could conduct an inspection of it. Howell, 168 F.R.D. at 503; Baliotis, 870 F.Supp. at 1287. In each case, photographs of the fire scene were taken prior to the demolition, and in Baliotis a two hour video tape was taken as well. The Howell Court, in rejecting defendant's suggestion to exclude plaintiff's expert report, explained that "[p]laintiff's case against both Maytag and Wal Mart is entirely dependent upon the report of its expert, pinpointing the microwave as the cause of the fire." Id. at 508. Therefore, if the court excluded this evidence, plaintiff would have been left with no evidence as to causation or fault, and defendants would have been entitled to summary judgment. Ibid. As such, the court reasoned that such a severe sanction was not necessary, and an adverse spoliation inference would suffice.
Likewise, in Baliotis, the court found that a defense was not rendered impossible as a result of the demolition of the fire scene, since the microwave oven, a coffee maker, the wiring from a refrigerator, as well as photographs of the scene and a two hour videotape were available to defendants. Id. at 1287. Based upon the factual setting involved, the court reasoned that "[r]equiring an insurer or property owner to maintain the scene of a fire until all potential defendants have been notified and afforded an opportunity to conduct independent inspections would, at minimum, be inefficient and wasteful. There is also the potential for harm to others by maintaining a safety hazard." Id. at 1292. The court held that the lesser sanction of a "spoliation inference" was sufficient. Ibid. ManorCare contends that this court should follow the rationale set forth in both Howell and Baliotis and hold that an adverse inference instruction would suffice as a sanction to level the playing field in this case.
In both Howell and Baliotis, the exclusion of the saved evidence, photographs, videotape, and inspection reports taken after the fires would have been the death knell to each plaintiff's lawsuit, since nothing would have remained upon which the plaintiffs could have supported their claims. Here, by contrast, evidence was obtained before the roof was repaired through inspections performed by ManorCare, Osmose, and Hoover, which can be utilized by both ManorCare and Osmose.
More importantly, the critical evidence in this case, the sample panels, is distinguishable from the evidence retained in those cases, namely, the microwave ovens and the related wiring. The sample plywood panels saved in this case are much more problematic from an evidentiary point of view. Unlike Howell and Baliotis, where it was agreed that there was only one microwave that was the apparent origination point of the fire, here we are dealing with over 1800 pieces of plywood, approximately ten of which were retained. More significantly, Osmose should not be placed in the position of accepting these panels as truly representative of the roof sheathing. This is precisely why ManorCare and/or those working on its behalf cannot be permitted to offer these sample pieces of FRT plywood and maintain that they are in fact representative of the 1800 pieces of plywood that only it had the opportunity to observe both before and after removal.
ManorCare cannot now be permitted to receive the benefit of any doubt as to: the veracity of its agents or employees in their testimony or reports made during or after the repairs; the likelihood that the retained sample panels were in fact representative of the total number of Osmose *484 panels; or even the benefit of ascertaining the precise number of Osmose panels vis-a-vis Hoover panels and the percentage of the total roof they comprised. Furthermore, ManorCare cannot now be allowed to benefit by forcing Osmose to rely upon reports and findings generated by its experts and those working on its behalf after foreclosing the possibility that Osmose could have its own representatives present during the repairs to conduct their own analysis of potentially adverse or defective roof conditions and the resulting impact upon the FRT plywood. The trial court correctly recognized as much:
In this case, the action of ManorCare, in destroying the vast majority of the FRT plywood, and in replacing the roof, without giving Osmose the opportunity to inspect and see its product, in the environment of the original roof, has the effect of reserving to itself all expert testimony based on its examination of selected FRT sheeting, and its observation of how the wood was placed in the original roof. In effect, Osmose is relegated, to a large extent, to either ignoring the plaintiff's evidence, or mounting a defense on the basis of the evidence gathered and selected by ManorCare.
Gone is the opportunity to discover potential construction-type defenses, such as blocked vents, leaks, moisture, roof temperatures, et cetera, that Osmose might have observed. Gone, too, is the opportunity for Osmose to have identified, selected, and tested FRT plywood of its choosing, and also to have made product identification for allocation purposes.
The action of ManorCare has most definitely tilted the playing field in its favor. No charge to the jury about adverse inferences to be drawn from spoliated evidence could level the field or cure the problem.
We therefore agree with the trial court that the adverse "spoliation instruction" proposed by ManorCare, although potentially curative in theory, would not truly "level the playing field." ManorCare's nonfeasance left Osmose in the dark as to when the repairs would begin and their duration. As such, we will not modify the trial court's decision in such a manner that would tacitly permit ManorCare to reap a benefit from its dereliction. Even if an adverse inference instruction would increase the likelihood that a jury would be skeptical of the testimony and reports offered by ManorCare concerning the roof repairs and findings derived therefrom, the fact remains that Osmose would be relegated to a position of having to challenge these findings on the sole basis that ManorCare's workers were either careless or biased against Osmose.
Preclusion of evidence as a sanction for failure to provide notice or make required disclosures is available "in the limited circumstances where a lesser sanction is not sufficient to remedy the problem caused by an inexcusable delay in providing the required notice, thereby resulting in substantial prejudice to the non-disclosed party's ability to mount an adequate defense." Mitchell v. Procini, 331 N.J.Super. 445, 453-54, 752 A.2d 349 (App.Div. 2000). Substantial prejudice in maintaining one's defense "implies the loss of witnesses, the loss of evidence, fading memories, and the like." Id. at 454, 752 A.2d 349.
In an analogous context, our Supreme Court has instructed that the exclusion of testimony by surprise witnesses is an appropriate sanction in cases where failure to provide notice prejudiced the non-delinquent party. See Wymbs v. Tp. of Wayne, 163 N.J. 523, 545, 750 A.2d 751 (2000) (finding that exclusion of the proffered testimony was the only viable option, where "[t]he surprise to plaintiffs was real, the State's conduct was inexcusable, and the prejudice to plaintiffs irreparable"). This remedy emanates from the principle that "[c]oncealment or surprise are not to be tolerated in a modern judicial system." Lang v. Morgan's Home Equip. Corp., 6 N.J. 333, 338, 78 A.2d 705 (1951). Indeed, *485 we have routinely explained that exclusion of testimony and/or evidence is an appropriate sanction to alleviate the prejudice resulting from serious discovery violations. See Russo v. Borough of Carlstadt, 17 N.J. Tax 519, 522-23 (App.Div.1998); Almog v. Israel Travel Advisory Serv., Inc., 298 N.J.Super. 145, 161, 689 A.2d 158 (App. Div.1997); Thomas v. Toys R Us, Inc., 282 N.J.Super. 569, 582, 660 A.2d 1236 (App. Div.), certif. denied, 142 N.J. 574, 667 A.2d 191 (1995); Catando v. Sheraton Poste Inn, 249 N.J.Super. 253, 257-58, 592 A.2d 294 (App.Div.), certif. denied, 127 N.J. 550, 606 A.2d 364 (1991); Sullivan v. Combustion Eng'g, 248 N.J.Super. 134, 142, 590 A.2d 681 (App.Div.), certif. denied, 126 N.J. 341, 598 A.2d 897 (1991); Mauro v. Owens-Corning Fiberglas Corp., 225 N.J.Super. 196, 206-07, 542 A.2d 16 (App. Div.1988), aff'd sub nom Mauro v. Raymark Indus., Inc., 116 N.J. 126, 145, 561 A.2d 257 (1989).
Because we find that nothing short of exclusion of all evidence obtained during and as a result of the roof repairs will truly "level the playing field," this is precisely what shall be done. We therefore reverse the trial court's grant of summary judgment to Osmose and remand this case with instructions that all evidence taken during and after the commencement of the roof renovation-including but not limited to reports, photographs, videos, and sample pieces of plywood-shall be inadmissible.
ManorCare's two remaining causes of action shall proceed against Osmose based upon the observations, findings, reports, and photographs taken by ManorCare, Osmose, Hoover, and any other party to this action prior to the commencement of the actual roof repairs, along with any subsequent reports or expert testimony based solely upon the evidence obtained prior to the commencement of the repair work. We agree with ManorCare's argument that even if Dr. DeBonis's testimony based on his testing of the Osmose samples from ManorCare's roof is excluded, ManorCare will still be able to support its claims with "Dr. DeBonis's testimony based on other sources, including Osmose's own test results" and the evidence ManorCare submitted in support of its fraud claims. This solution will return each party to the position it occupied prior to the commencement of the roof repairs, when sufficient information evidently existed for ManorCare and Osmose to proceed with settlement negotiations, which were never effectuated.
In this scenario, ManorCare will be adequately sanctioned, since it will not be able to specify the percentage of Osmose plywood contained in the roof. This sanction will also alleviate Osmose's reasonable concern that the samples retained by ManorCare were not truly representative of all of the Osmose FRT plywood removed from the Medbridge facility's roof.

III.
Because a plaintiff who destroys evidence interferes with a defendant's ability to defend a lawsuit and right to discovery, "the nonspoliating defendant may even be entitled to counsel fees." Aetna, supra, 309 N.J.Super. at 365, 707 A.2d 180 (citing Hirsch, supra, 266 N.J.Super. at 245, 628 A.2d 1108 (quoting Pressler, Current N.J. Court Rules, comment on R. 4:23-4 (1993))). ManorCare argues that the trial court improperly awarded attorneys fees of $10,000 to Osmose. We agree. Our research has not revealed a single New Jersey case justifying the grant of attorneys fees in a spoliation of evidence case. As such, this case presents a poor candidate for such an award, especially since there was no finding that ManorCare intentionally spoliated evidence. Because no attorneys fees were awarded in Aetna or Hirsch, we hold that attorneys fees were improperly awarded in this case. ManorCare's dereliction will be sufficiently punished by the evidentiary bar set forth supra. The imposition of attorneys fees simply goes too far. Therefore, we reverse the trial court's award of $10,000 in attorneys fees to Osmose.
*486 Reversed and remanded for further proceedings consistent with this opinion.