**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0218-18T3

GINA DORRITY,

     Plaintiff-Appellant/
     Cross-Respondent,

v.

WAKEFERN FOOD
CORPORATION,

     Defendant-Respondent/
     Cross-Appellant,

and

SUNRISE SUPERMARKETS,
INC., t/a SUNRISE SHOPRITE
OF PARSIPPANY LL, FRANK
SBLENDORIO, SR., individually,
and THOMAS F. HARTE, individually,

     Defendants.

_____

Argued October 22, 2019 – Decided January 15, 2020

Before Judges Hoffman, Currier and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-3221-16.

Christopher William Hager argued the cause for appellant/cross-respondent (Hager Law, LLC, attorneys; Christopher William Hager, on the briefs).

Mark Diana argued the cause for respondent/cross-appellant (Ogletree, Deakins, Nash, Smoak & Stewart, PC, attorneys; Mark Diana and Michael J. Riccobono, on the briefs).

PER CURIAM

Between 1991 and 2016, plaintiff worked at a pair of ShopRite supermarket stores owned by defendant Sunrise Supermarkets, Inc. (Sunrise), a member of defendant Wakefern Food Corporation (Wakefern), a grocery cooperative. After Sunrise terminated her employment in February 2016, plaintiff filed suit against both Sunrise and Wakefern, alleging age discrimination. In 2017, plaintiff filed an amended complaint, asserting claims of fraudulent concealment and spoliation of evidence against Wakefern.

In June 2018, the Law Division granted the summary judgment dismissal of plaintiff's claims against Wakefern. After plaintiff settled her claims against Sunrise in September 2018, she filed this appeal, challenging the orders dismissing her claims against Wakefern. Plaintiff also appeals from an earlier order that denied her motion seeking a summary judgment determination that

Wakefern acted as her "employer" under the LAD. Wakefern filed a protective cross-appeal addressing the same issue. For the reasons that follow, we affirm the summary judgment dismissal of plaintiff's claims against Wakefern. We dismiss Wakefern's cross-appeal as moot.

I

Wakefern's Relationship with Sunrise

Wakefern describes itself as "a member-owned cooperative" consisting of "approximately [fifty] Member companies" that "independently own and operate supermarkets doing business under the ShopRite trade name." The Members operate approximately 325 stores.

Wakefern requires Members to purchase eighty-five percent of their retail sales, and all of their beef, from Wakefern. Further, Members must "maintain their stores at a level that is acceptable by the Wakefern quality assurance division that does store inspections, product inspections, etc." and must also "participate in a common advertising theme or circular."

Wakefern provides numerous services for Member stores, such as procuring goods for resale by the stores, managing intellectual property such as trademarks, accounting services, marketing and merchandising services, advertising, training, and loss prevention services. Through its computer

A-0218-18T3

information systems division, Wakefern also provides Members various helpdesks (including a customer service hotline, a logistics line, and an IT helpdesk), insurance services, inventory management, and IT support.

Wakefern owns the licenses for the computer software Members use, including PeopleSoft (used to manage payroll processing), Kronos (a time management software), and Magic (a helpdesk software). Wakefern hosts and maintains the software, as well as the networks and equipment which run the software; in addition, Wakefern serves as the email administrator for Members.

Wakefern negotiates collective bargaining agreements with the ShopRite employees' union. The union agreement addresses a wide range of topics, including seniority, wages, overtime, holidays, lunch periods, funeral leave, health and welfare benefits, and arbitration and grievance procedures.

In addition, Wakefern controls the point-of-sale technology used by each Member store. Wakefern controls digital coupons loaded onto a customer's "ShopRite Price Plus card" and redeemed at stores. Wakefern directs customer service employees on how to answer questions related to the coupons.

Regarding loss prevention matters, Wakefern monitors weekly "Lane Hawk" reports that monitor the bottom of shopping carts for items not scanned for purchase. Wakefern also hires a third-party to conduct a "mystery shopper"

A-0218-18T3

program, whereby individuals pose as customers to evaluate stores for safety, cleanliness, and customer service; however, this service is optional.

Wakefern also maintains a website for employee training; however, Members may choose to forego the training, or modify the training programs as they see fit. Notwithstanding Wakefern's involvement in many areas of store operations of its Members, the record contains no evidence of Wakefern's involvement in training, developing policies, or investigating claims related to discrimination, retaliation, or harassment. Further, the record lacks any evidence of Wakefern's involvement in the staffing of any stores, hours of operation, or the hiring or firing of Member employees.

<u>Plaintiff's Employment by Sunrise</u>

Born in 1957, plaintiff began working as a part-time cashier at the West Caldwell Shoprite – owned by Sunrise – in 1991. When plaintiff applied for her position, she completed a form with the following heading:

APPLICATION FOR EMPLOYMENT

WAKEFERN FOOD CORPORATION

SHOP-RITE SUPERMARKETS.

After submitting her application, plaintiff interviewed for the cashier position with a Sunrise store manager, who offered her the position on the spot.

5

Plaintiff never interviewed with a Wakefern employee, nor does the record indicate that Wakefern participated in the hiring decision. In fact, the record lacks any evidence of Wakefern's involvement in any Sunrise personnel decisions.

Plaintiff received cashier training at the Sunrise store from Sunrise employees. Eight years later, Sunrise moved plaintiff to the position of courtesy counter clerk. Sunrise employees trained plaintiff for that position and informed her of her duties. In 2001, plaintiff received a promotion to head bookkeeper and head courtesy clerk. In 2011, Sunrise transferred plaintiff to its Parsippany store, where she maintained the same position and duties. Sunrise alone made these decisions, with no involvement of Wakefern.

In addition to her duties as head bookkeeper and head courtesy clerk, plaintiff handled several human resource (HR) matters. Sunrise assigned these additional tasks without input from Wakefern. Some of the training for plaintiff's HR duties came from Sunrise employees, but some also came from Wakefern, such as how to use the Kronos system to manage scheduling and to record "absence[s] and late's." Plaintiff presented no evidence of any Wakefern involvement in Sunrise's decision to assign these duties to plaintiff.

As part of her HR duties, plaintiff completed disciplinary notices for employees who failed to arrive on time or missed work. Plaintiff also handled disciplinary notices for employees with time clock violations or cash shortages. Plaintiff sent these notices to Sunrise's HR department or department managers, but not to Wakefern.

Plaintiff did not inform Wakefern if she planned to take a vacation, or if she called out sick – Sunrise handled all such matters. Sunrise alone assigned plaintiff her work schedule, as it did for all of its employees.

Plaintiff received awards for her work, including perfect attendance, employee of the month, and employee of the year. These awards came directly from Sunrise, not Wakefern. Until February 2016, plaintiff received positive employee evaluations. Wakefern did not issue any performance reviews to plaintiff nor did it participate in any evaluations plaintiff received from Sunrise.

Plaintiff's paychecks listed the payor as "Sunrise SR of Parsippany LLC," with no mention of Wakefern. Plaintiff could not recall ever receiving a W-2 tax form indicating Wakefern as her employer. Plaintiff was not covered by Wakefern's employee benefit plans, nor was she eligible for such coverage.

The Sunrise ShopRite Associate Handbook given to Sunrise employees states the information contained therein "is proprietary Wakefern information

(use pursuant to Company instructions)." The handbook calls for a "progressive counseling" process for certain employee infractions. The process calls for four steps of warnings and reprimands before termination occurs; however, the handbook states certain conduct could result in immediate discharge, including: "discourtesy to customers," "poor job performance," "violating time and attendance procedures," and "theft of any kind."

Wakefern provides the handbook to its Members for use, but they remain free to reject or modify it as they see fit. Sunrise inserted some of its own policies, including policies addressing progressive discipline, attendance, vacations, sick time, personal time, and tuition reimbursement.

Wakefern provides and manages most of the Sunrise's store computer software. In fact, all the software plaintiff utilized to complete her job originated with Wakefern. Plaintiff sent financial information to Wakefern's ShopRite Financial Services (SFS)[1] via an Oracle-based program each day. SFS reviewed plaintiff's bookkeeping work and would contact her through the Oracle program's "notes" function about any issues in sales reports. SFS personnel

---

[1]  SFS provides optional accounting and other financial analysis services to Members for a fee.

provide assistance, but do not supervise, evaluate, review, discipline, or control the bookkeepers at Member stores.

Plaintiff exchanged emails with Wakefern employees about HR issues or technology issues. Wakefern tracked these help desk communications, first using a computer program called "Magic" before later switching to a program named "Front Range."

Wakefern's cash and sales system manages and monitors the sales and cash operations of all Member stores. Plaintiff used this system to complete her work. Wakefern trained plaintiff on point-of-sale software and assisted her over the phone regarding her bookkeeping responsibilities.

In 2014, Sunrise hired Andrew Leaman for a newly created position – customer service manager – at its Parsippany store. Leaman never previously worked for a ShopRite store and lacked any relevant experience before starting the job. Sunrise never offered the position to plaintiff, nor did it consider her for it, despite her title as head courtesy clerk. Less than a year later, when Leaman took another position, Sunrise replaced him with a woman, who was twenty-six years old at the time.

In 2015, Wakefern hired Strategic Resources Group (SRG) to examine ShopRite stores and compare their employee hiring and retention practices with

other retailers, such as Wegmans, Trader Joe's, Target, and Home Depot. Along with other strategies, the study recommended that Members focus on hiring high school level students for summer part-time work, before hiring qualified student workers for full time positions.

Sunrise management later sought to hire a computer-generated ordering (CGO) supervisor. An email sent by a Sunrise manager described plaintiff as "not interested" in the position. Sunrise selected a part-time cashier, who was about to graduate from school with an IT degree. He was approximately twenty-three years old and described as a "bright young man." Joanne Zambrello, Vice President of Human Resources with Sunrise, admitted the hiring was consistent with the hiring objectives of the SRG report, which recommended hiring "younger workers," including part-time students to long-term positions.

In April 2015, Leaman transitioned to the role of IT supervisor after the previous supervisor retired. Plaintiff had requested the position as she had worked with Wakefern's systems for several years. However, the record fails to demonstrate that plaintiff possessed the necessary qualifications for the job. She could not remember having experience in setting up IT equipment; she could not remember having applied for any other IT positions; she did not know the meaning of several of the job's requirements such as "providing technological

guidance to Sunrise Liquor Stores" or "network security protocols", and she could not remember taking computer courses since graduating college, and had no computer programming training.

The record lacks any evidence that Wakefern had any input into the hiring decision for the IT supervisor position, or that plaintiff reached out to any Wakefern employees about her interest in the position. When Leaman, who was then plaintiff's supervisor, told plaintiff he had received the position, plaintiff complained, recalling that she told him "it was discriminatory," and that she did not get the position because she "was older." According to Leaman, plaintiff said, "I was supposed to have this job, and they gave it to you." Leaman reported plaintiff's comment to Zambrello, who did not investigate it.

In May 2015, Sunrise removed plaintiff's access to override the time clock and access the payroll system, and her responsibility to track late and absent employees; in addition, Sunrise changed plaintiff's job title from "head bookkeeper" to simply "bookkeeper." Wakefern had no input in these decisions.

Because he had been her supervisor when he worked as customer service manager, Leaman conducted plaintiff's employee "Core Competency Assessment" in June 2015. He graded her a 2.70 out of a possible five. This score ranked as "good," and indicated plaintiff "consistently meets job

requirements." The record contains no evidence that Wakefern approved, reviewed, or participated in plaintiff's evaluation in any way.

In August 2015, plaintiff was assigned to work shifts beginning at 3 a.m. Sunrise made this decision without input from Wakefern. Sunrise further assigned plaintiff to work thirty-five straight days from January to February 2016 to cover for a coworker who had taken a vacation. Plaintiff never complained about these work schedule assignments to a Sunrise superior nor to anyone at Wakefern.

In February 2016, while on her lunch break, plaintiff spoke with a customer, who had pictures of the Pope he wanted to show her. When her break ended, plaintiff punched back in, but then continued to speak with the customer. After the conversation, plaintiff failed to complete her work before the end of her shift; as a result, she required a supervisor to override the time clock for her "to punch out." Later that day, Sunrise called plaintiff at home and told her she was suspended pending termination for, in plaintiff's words, "Stealing time."

On February 25, 2016, plaintiff attended a meeting between her union and Sunrise store managers. At the meeting, plaintiff expressed her belief that she was treated unfairly and that she was simply providing good customer service. Plaintiff's brief states that she complained of age discrimination; however, a

written statement plaintiff prepared for the meeting contains no mention of age discrimination or Wakefern. Plaintiff's statement does discuss how other employees committed worse violations and avoided termination.

At the end of the meeting, plaintiff received termination paperwork. Sunrise replaced plaintiff with an employee at least twenty years younger. The record contains no evidence that Wakefern participated in the firing of plaintiff or in the hiring of her replacement. On May 6, 2016, plaintiff filed suit against Sunrise and Wakefern. Wakefern received the complaint one week later.

Plaintiff's Spoliation Claim

Wakefern maintains a "Records Retention Policy" (RRP) to "use, maintain and destroy" records consistently. The policy calls for litigation holds upon written communication "as a result of current or anticipated litigation." The hold suspends the "normal disposition, processing or destruction of Records."

The RRP does not allow for employee discretion on the destruction or retention of "records," which Wakefern retains or destroys in accordance with the policy. The policy defines "records" as materials "directly related to the Company's operations and management." Wakefern maintains "records" in accordance with a Records Retention Schedule (RRS), while "general information" – defined as materials without "business, financial, legal,

regulatory, or policy reasons" to be maintained – "should be kept only for as long as it enables an Associate to do his or her job . . . but in no event, for more than two years . . . ." No specific retention schedule addresses emails, as they may constitute records or general information, depending on their contents.

To delete an email account, after an employee's termination, a member of the "security admin" team deletes the account, making it nonfunctional. A "cleanup" process then begins, usually within weeks, which removes the actual files. The cleanup is a manual task; accordingly, Wakefern maintains no audit trail indicating the time of each account's deletion. A backup system keeps a copy of all email accounts on the server; however, Wakefern recycles and reuses the backup tapes every three weeks. Wakefern disabled plaintiff's email account on April 14, 2016. The cleanup process followed within two to three weeks.

Plaintiff's initial complaint made no reference to any email communications she sent or received. The complaint made no reference to any communications she ever had with any Wakefern employees. Plaintiff's complaint made no reference to the Magic or Front Range system, nor any communications between her and Wakefern's Helpdesk. She did not mention any such communications until July 12, 2016, when she filed a certification in opposition to a Wakefern motion to dismiss. Plaintiff first made reference to

14

emails with Wakefern in March 2017 – nearly ten months after she filed her complaint, and nearly ten months after the email back-up tapes were recycled.

Because the server had been discarded, Wakefern did not produce any of the Magic communications during discovery; however, it did produce five years of communications through the Front Range system. Plaintiff indicated she could testify about the Magic communications and their contents.

After Wakefern could not produce plaintiff's emails, Oracle notes, or Magic communications during discovery, plaintiff filed an amended complaint in December 2017, asserting her fraudulent concealment and spoliation of evidence claims.

## II

We apply the same standard as the trial court in reviewing the granting of a motion for summary judgment. Townsend v. Pierre, 221 N.J. 36, 59 (2015). If there is no factual dispute, and only a legal issue to resolve, the standard of review is de novo and the trial court rulings "are not entitled to any special deference." Manalapan Realty, L.P. v. Manalapan Twp. Comm., 140 N.J. 366, 378 (1995). Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and

A-0218-18T3

that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). The court considers whether "the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

### Dismissal of Plaintiff's LAD Claims Against Wakefern

Plaintiff's argues that Wakefern is liable for failing to investigate her claims of discrimination and for failing to take adequate remedial measures. Claims for failure to investigate and take remedial measures arise when an employer or supervisor has actual knowledge of the discrimination and do not promptly and effectively act to stop it. Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 622 (1993). However, plaintiff cannot demonstrate actual knowledge. She admitted she did not remember if she had ever complained of discrimination to anyone at Wakefern. Patrick Durning, Manager of Labor Relations for Wakefern, certified that he did not know of plaintiff's discrimination complaints prior to the filing of her lawsuit. Dewey Cannella, Vice President of the Labor Relations Division for Wakefern, also certified that he did not know of plaintiff's discrimination complaints until she filed suit.

A-0218-18T3

Plaintiff did complain to Leaman after she did not receive the IT position, and Leaman reported her complaint to Zambrello; however, neither Zambrello nor Leaman worked for Wakefern – they both worked for Sunrise. The fact that plaintiff alleged discrimination to Sunrise employees did not impute knowledge to Wakefern.

Further, plaintiff's own written statement that she read at the meeting between her union and Sunrise store managers did not mention discrimination. A general complaint of unfair treatment does not provide notice of a complaint of discrimination. See Dunkley v. S. Coraluzzo Petroleum Transporters, 437 N.J. Super. 366, 377 (App. Div. 2014) (citing Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d Cir. 1995)). Plaintiff failed to present any evidence of Wakefern involvement in the discriminatory or retaliatory conduct she alleged. Therefore, it is undisputed in the record that Wakefern had no knowledge of plaintiff's complaints of discrimination before she filed suit.

In light of the absence of any evidence that Wakefern in any way participated in the discriminatory conduct plaintiff allegedly experienced, plaintiff raises alternative arguments for imposing liability upon Wakefern. We briefly address each argument.

Plaintiff first argues the relationship between Wakefern and Sunrise warrants piercing "the corporate veil" to impose liability upon Wakefern. The piercing the corporate veil doctrine is used when a subsidiary constitutes "a mere instrumentality of the parent corporation," and requires a finding that the "parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent." Marzano v. Computer Science Corp., 91 F.3d 497, 513 (3d Cir. 1996). The doctrine does not apply here because Wakefern is not Sunrise's parent company; to the contrary – Sunrise, along with the other Members, owns Wakefern. A substantial and ongoing business, Sunrise is not a "shell" company, with no separate existence, formed to insulate Wakefern from liability.

Plaintiff next argues that Wakefern jointly employed plaintiff, along with Sunrise. The record does not support this argument. Plaintiff worked at Sunrise stores, where Sunrise set her work schedule, assigned her job duties, and paid her salary and benefits. Consistent with the member-owned cooperative model, Wakefern provided no input in Sunrise's decision to suspend and then terminate plaintiff's employment. While we apply the twelve-factor Pukowsky[2] test "to determine who is an employer in cases lacking an actual or customary employer-

---

[2] Pukowsky v. Caruso, 312 N.J. Super. 171, 185 (App. Div. 1998).

employee relationship," <u>Thomas v. Cty. of Camden</u>, 386 N.J. Super. 582, 595 (App. Div. 2006), the overwhelming evidence demonstrating a customary employment relationship between plaintiff and Sunrise precludes the application of <u>Pukowsky</u> here. Even if <u>Pukowsky</u> applied, analysis of the twelve factors overwhelmingly indicates that Wakefern was not plaintiff's joint employer.

Since the record clearly shows that plaintiff was a Sunrise employee, and not a Wakefern employee, and that Wakefern had no involvement in the discriminatory conduct alleged by plaintiff, the motion court properly granted the summary judgement dismissal of plaintiff's LAD claim.

<u>Dismissal of Plaintiff's Spoliation Claims Against Wakefern</u>

Plaintiff's spoliation claim concerns three categories of electronically stored information (ESI): emails she exchanged with Wakefern employees, communications with Wakefern employees made through the Oracle software, and communications with Wakefern employees through the Magic software.

Spoliation involves "the hiding or destroying of litigation evidence, generally by an adverse party." <u>Rosenblit v. Zimmerman</u>, 166 N.J. 391, 401 (2001). "Spoliation of evidence in a prospective civil action occurs when evidence pertinent to the action is destroyed, thereby interfering with the action's proper administration and disposition." <u>Manorcare Health Servs., Inc. v.</u>

Osmose Wood Preserving, Inc., 336 N.J. Super. 218, 226 (App. Div. 2001) (quoting Aetna Life and Cas. Co. v. Imet Mason Contractors, 309 N.J. Super. 358, 364 (App. Div. 1998)); see also Rosenblit, 166 N.J. at 400-401.

A duty to preserve evidence arises when there is: "(1) pending or probable litigation involving the [plaintiff]; (2) knowledge by the [defendant] of the existence or likelihood of litigation; (3) foreseeability of harm to the [plaintiff], or in other words, discarding the evidence would be prejudicial to [plaintiff]; and (4) evidence relevant to the litigation." Manorcare, 336 N.J. Super. at 226 (quoting Aetna Life and Cas. Co., 309 N.J. Super. at 366-67).

Whether a party has an obligation to save evidence in a given context is a question of law. Aetna Life, 309 N.J. Super. at 365 (citing Hirsch v. Gen. Motors Corp., 266 N.J. Super. 222, 234 (Law Div. 1993)). Thus, the trial court's conclusion that plaintiff had a duty to preserve the disputed evidence is subject to de novo review. See Manalapan Realty, 140 N.J. at 378 ("A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference."). However, the factual findings on which the trial court based its legal conclusions are entitled to deference. Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474 (1974).

A-0218-18T3

We disagree with plaintiff that the motion record established a genuine issue as to any material fact. To establish a claim for fraudulent concealment of evidence, a plaintiff must prove:

> 1) That defendant in the fraudulent concealment action had a legal obligation to disclose evidence in connection with an existing or pending litigation;
>
> 2) That the evidence was material to the litigation;
>
> 3) That plaintiff could not reasonably have obtained access to the evidence from another source;
>
> 4) That defendant intentionally withheld, altered or destroyed the evidence with purpose to disrupt the litigation; [and]
>
> 5) That plaintiff was damaged in the underlying action by having to rely on an evidential record that did not contain the evidence defendant concealed.
>
> [Tartaglia v. UBS PaineWebber, Inc., 197 N.J. 81, 118 (2008).]

Although Wakefern learned of plaintiff's lawsuit in May 2016, there was nothing in the complaint alerting Wakefern that plaintiff's email account might contain evidence relevant to her joint employer allegations. Plaintiff's complaint made no reference to any emails or other communications she ever exchanged with any Wakefern employee during her employment at Sunrise. Nor did

plaintiff's complaint contain a demand to preserve evidence. Plaintiff also did not refer to any emails she may have exchanged with Wakefern in a July 12, 2016 certification she submitted in opposition to a Wakefern dismissal motion. Rather, plaintiff's first reference to emails with Wakefern occurred in March 2017 – nearly ten months after she filed her complaint, and nearly ten months after the email back-up tapes were recycled.

We reject plaintiff's argument that the motion judge erred because "there is no New Jersey Court Rule or case law requiring a plaintiff to first make a written request for evidence to be preserved, whether in the complaint or otherwise." The judge did not hold that plaintiff needed to make a written request to preserve evidence in order to trigger Wakefern's duty to preserve ESI. Rather, the judge correctly concluded, based on all of the undisputed facts, including the absence of a preservation demand, that Wakefern had no reason to know – at the time of deletion – that any of the ESI at issue was relevant to any of plaintiff's claims. Additionally, plaintiff failed to demonstrate the relevance or importance of any emails that were subsequently deleted.

Plaintiff conceded she lacked any evidence that defendant intentionally withheld or destroyed the ESI she requested. When asked if she had any evidence of Wakefern deleting the emails to interfere with her case, plaintiff

provided none. Instead, she simply stated, "They haven't produced anything. That's all I know . . . ." Lastly, plaintiff cannot prove that Wakefern's actions damaged her in her LAD case because she admitted she can testify to the contents of the communications. Cf. Rosenblit, 166 N.J. at 411 (holding that where the party seeking discovery ultimately receives it, a spoliation inference is not appropriate).

We are satisfied the motion judge properly granted the summary judgment dismissal of Wakefern's spoliation claim since the record lacks sufficient evidence to establish a genuine dispute that Wakefern improperly destroyed any records relating to plaintiff's asserted claims or otherwise caused her any damage.

Affirmed. We dismiss Wakefern's cross-appeal as moot.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION