1 A.3d 658

ROBERTET FLAVORS, INC., PLAINTIFF–RESPONDENT, v. TRI–
FORM CONSTRUCTION, INC., ROBERT KARABINCHAK, AND
ACADEMY GLASS, DEFENDANTS–APPELLANTS, AND TAMI-
GITHENS, INC., A–TECH CONCRETE COMPANY, INC., AND
FISHER CONTRACTING, INC., DEFENDANTS. AND TRI–
FORM CONSTRUCTION, INC., AND ROBERT KARABINCHAK,
THIRD–PARTY PLAINTIFFS, v. A–TECH CONCRETE COMPA-
NY, INC., FISHER CONTRACTING, INC., NEWARK ELEC-
TRIC, INC., ADVANCE INTERIORS, INC., ACADEMY GLASS,
INC., STUCCO SYSTEMS, INC., U.S. ENGINEERING LABORA-
TORIES, INC., AUTOMATION CONCEPTS, INC., AND FLAVIO
TAMBURRI, THIRD–PARTY DEFENDANTS.

Argued September 15, 2009—Decided August 3, 2010.

*David J. Dering* argued the cause for appellants Tri–Form Construction and Robert Karabinchak (*Leary, Bride, Tinker & Moran,* attorneys).

*Marc Shortino* argued the cause for appellant Academy Glass, Inc. (*Gartner & Bloom,* attorneys).

*Patrick T. Collins* argued the cause for respondent Robertet Flavors, Inc. (*Franzblau Dratch,* attorneys).

Justice HOENS delivered the opinion of the Court.

Commercial construction projects often present unique challenges to the courts, in part because when an argument erupts over a claimed construction defect, it is inevitably complicated by the conflicting interests of the parties. The project owner wants the building to be free of defects, while other parties to the project, including the general contractor, its subcontractors and suppliers, the construction manager, if any, the architect and other design professionals, each may dispute the existence of, the extent of, and the responsibility for, any claimed defects. Moreover, each of them may seek to shift the blame for any conceded defect to others and each will likely assert that it has the right to investigate the claim and to attempt to cure any defects that are identified.

Further compounding those competing interests, time itself may create overriding considerations for the building's owner. Particularly if the claimed defect threatens the building's integrity or the owner's ability to conduct its business, the owner will view the time within which to remedy a defect in a building's construction as being constrained. The building's owner, fearing that existing, identified defects, if not cured promptly, will worsen or adversely affect other parts of the structure, may have limited patience with a contractor who does not resolve a problem quickly. The owner may lose confidence in the contractor's ability to remedy a defect if that contractor's response is slow or if proposed resolutions are inadequate. In either situation, the building owner may hasten to

seek solutions from experts, consultants, or contractors in an effort to prevent a relatively minor problem from turning into a major failure of one of the building's systems.

Nor is the building's owner the only party whose interests complicate the dispute. A contractor who is being blamed for a problem may conclude that there is no defect to be cured and, if the complaints persist, may come to regard the owner as unreasonable or as seeking perfection when the work was performed in an adequate, acceptable, and workmanlike manner. Alternatively, the contractor may recognize that there is a defect and try to resolve it, or it may decide that the problem was caused by a supplier, laborer, or another contractor outside of its control, or has resulted from faulty plans or specifications.

Other parties to a large construction project will also have their own unique perspectives on the owner's claim that there is a problem to be addressed. General contractors, construction managers, architects, and engineers each have a role to play in the project and interests to protect in the event that a claimed defect is identified. Questions about whether the defect arose because of faulty plans and specifications, improper design, poor workmanship, defective materials, insufficiently skilled subcontractors, or inadequate supervision may divide the participants and confound the ability to reach a workable solution.

As complicated as the relationships inherently are, they are compounded when they play out in the shadow of threatened or actual litigation. The reality of how project owners, contractors, and related professionals behave, each with distinct and often inconsistent goals and motivations, frequently leads one or more of them to act in ways that impact on the eventual conduct of that litigation.

The building owner who only wants to solve a problem and prevent it from getting worse may undertake testing and repairs without waiting for a resolution by the contractor whose work the owner believes is the cause. The contractor called back to the building for a repair may make suggestions or corrections without

undertaking a thorough investigation or fully documenting the alleged defect or identifying other potential causes. Even if the parties act with the purest motives, evidence of the extent or the cause of any claimed defect may be compromised or destroyed as testing and investigations are undertaken and as repair, retrofitting, or replacement of affected building systems or components is completed.

It is preferable, of course, to have an orderly procedure for identifying a defect, alerting the allegedly culpable party, conducting an investigation and testing that is observed and documented by representatives for all potentially responsible parties, identifying a cause, and achieving a solution. In the real world of construction projects, however, the parties do not always behave that way and may proceed to develop a solution without preserving all of the evidence that is needed to determine liability or prove damages.

This matter, which arises in the context of a large commercial building with a claimed, but now cured, defective window system, exhibits many of these competing concerns. The specific question before us is how courts should respond when an alleged defect has been remediated and evidence concerning that defect has been spoliated. More to the point, the question is how to fashion an appropriate remedy when there is some, but by no means complete, evidence of the defect and its cause, when prior to the remedial work, the party alleged to have caused it had opportunities to evaluate it and was unsuccessful in addressing it, and when the owner failed to alert others who might have some responsibility for the defect in time to include them in the process of identifying and resolving it.

Commercial construction projects present the courts with unique challenges, but they also provide opportunities to achieve creative ways of fairly sanctioning acts of spoliation. Because this dispute includes most of the familiar themes seen in such projects, it serves as a ready example for addressing spoliation now and in the future.

## I.

Plaintiff Robertet Flavors, Inc., creates, manufactures, and sells flavorings to the food, beverage, and pharmaceutical industries. In 1995, plaintiff's representatives met with an architect, who designed a new corporate headquarters that would be L-shaped, with a two-story high entry way. The larger leg of the building is a single story in which the manufacturing facilities are housed and the smaller leg is two stories high, with laboratories and administration offices on both floors.

### A.

Plaintiff acted as its own general contractor, but hired defendant Tri–Form Construction, Inc., and its president, defendant Robert Karabinchak, to serve as the construction manager for the project. In that role, Tri–Form was responsible for organizing the bids and making recommendations to plaintiff about selecting the contractors. After the work began, Karabinchak coordinated, supervised, and approved payment for all work done by the contractors on the project.

Through a competitive bidding process, plaintiff selected defendant Academy Glass, Inc. to install two separate window systems in the building. According to the architectural design, a curtain wall window system was to be installed in the entrance atrium and a strip-window system was to be utilized on both floors of the administration and laboratory wing of the building. The plans and specifications required both window systems to be manufactured by Kawneer Company, Inc.

The issues on appeal focus only on the Kawneer strip-window system,[1] which is installed as a continuous ribbon, with one strip of

---

[1] Plaintiff's complaint included claims asserting that the curtain wall system was not properly installed and that it leaked extensively. Because there was virtually no evidence from which an independent evaluation of the claimed curtain wall defects could be made after the owner's extensive remediation, plaintiff has abandoned that aspect of its claim.

windows on each of the two floors. An Exterior Installation Finishing System (EIFS) was installed above and below each set of strip windows, with a metal coping at the top of the building. The strip-window system is designed to allow a certain amount of water to penetrate the windows and then exit at the bottom of the window frame. It relies on flashing to permit water to weep out by acting as a channel for the water's escape. Academy Glass began its work in late 1997 and finished in 1998, all under the supervision of Karabinchak, who approved Academy Glass's requests for payment.

Plaintiff moved into the administration/laboratory building in early December 1998, and began to occupy the manufacturing part of the building when construction was completed in March or April 1999. Beginning early in 1999, plaintiff's employees noticed that water was leaking in through the strip-window system along the entire length of one side of the two-story administration/laboratory wing of the building. Plaintiff began calling Academy Glass early in 1999 to have it evaluate the windows and fix the leaks.

Although the parties dispute how often Academy Glass responded to the calls, and what, if anything, Academy Glass did to address the problem, they agree that Academy Glass conducted visual inspections of the interior and exterior of the building and undertook some efforts to solve the leaking, which principally involved suggesting that the windows be re-caulked. Ultimately, those efforts were unsuccessful. Plaintiff concedes that the windows did not leak continuously, and that the severity of the problem depended to some extent on the angle and the intensity of the rain as well as the way in which the wind was blowing. However, as the year progressed, the leaks grew worse and by early 2000, plaintiff was placing five-gallon buckets on the window sills during heavy rainstorms to collect the leaking water.

Throughout 2000, plaintiff continued to contact Academy Glass about the leaks, but by the end of that year, plaintiff's calls were not being returned. Eventually, some time early in 2001, plaintiff stopped trying to have Academy Glass solve the problem of the

leaks, which by then had resulted in visible water damage and peeling wallpaper.

By the summer of 2001, plaintiff had decided to pursue litigation, and it hired a forensic architect to inspect the windows. Based on the architect's advice, plaintiff hired Joseph Frezza, a consultant affiliated with an environmental testing firm, J.A. Frezza and Associates, L.L.C., to identify the cause of the problem and to fix it. After some preliminary testing late in 2001, Frezza notified plaintiff that a section of the strip windows needed to be removed in order to determine the cause of the problem.

In January 2002, plaintiff filed its complaint against defendants Academy Glass, Tri–Form, and Karabinchak,[2] alleging breach of contract, breach of warranty, and fraudulent misrepresentation based on construction defects, as well as claims asserting that the construction project had been inadequately managed. At the time, plaintiff was represented by Milton Breitman, a solo practitioner with whom plaintiff had a pre-existing attorney-client relationship.

In February 2002, Frezza, accompanied by William Munro, the President and CEO of Pioneer Glass Corporation, a window installation firm, removed a section of the strip windows in the lunchroom of the administration building and discovered both moisture and mold. Munro evaluated the window system and Consulting & Testing Services, Inc. (CTSI) was hired to evaluate the mold problem. Munro recommended that plaintiff remove all of the strip windows and replace them with a new window system. The CTSI report revealed that there was a significant mold problem in the outside offices on both floors of the administration/laboratory wing of the building. After receiving the reports from Munro and CTSI, plaintiff decided that it needed to replace the strip-window system as Munro had recommended and that it

---

[2] Plaintiff's complaint named numerous other defendants because there were a variety of other claimed construction defects in the building. None of those claims and none of those parties are relevant to the issues on appeal.

had no choice but to remove and replace everything in the building that had been contaminated with mold, including the interior walls, insulation, and carpeting.

On or about March 22, 2002, Tri–Form served its answer to the complaint and its discovery demands on Breitman. The discovery demands included the following:

> In lieu of a more formal notice to inspect, this party hereby demands that it be notified immediately of any intended, planned or ongoing remediation, replacements or other work that relates to the subject property. The property is evidence in this case and must be preserved in an unaltered condition so that this party may properly inspect the premises.

Although the record is unclear as to the timing, Academy Glass served its answer and discovery demands as well. There is no evidence in the record that plaintiff's attorney ever advised plaintiff about either of the defendants' demands for an inspection of the premises.

In the meantime, plaintiff decided that it needed to proceed with its remediation efforts. It hired Frezza to coordinate the work, Pioneer Glass to replace the windows, and other entities to remove the damaged walls and insulation, remediate the mold, and provide security and heat. Remediation of the strip-window system included removal of all of the glass and the aluminum around the windows. In addition, according to Munro, extrusions required as part of the Kawneer system needed to be ordered and installed. Late in the spring of 2002, plaintiff learned that it would take ten to fourteen weeks to obtain replacement glass for the strip-window system, as a result of which plaintiff did not begin to repair the strip-window system until the middle of December 2002. The project, once started, was scheduled to be finished by the first week of February 2003.

Although plaintiff advised Breitman about the investigation by Frezza and Munro and about its plans to repair or replace the strip windows, Breitman did not pass that information along to counsel for Academy Glass or Tri–Form. When counsel for Academy Glass spoke with Breitman during the summer of 2002, by which time the window materials had already been ordered,

Breitman did not disclose that remedial work was scheduled to begin or that mold had been discovered.  On September 26, 2002, Tri–Form's counsel attended a document inspection at plaintiff's premises, during which he concedes that he reviewed reports that revealed that the curtain-wall system had already undergone remedial work.  He did not inquire about any plans to remediate or replace the strip windows and therefore was not aware that remediation of the strip-window system had already been scheduled.

In October 2002, plaintiff's president, Mark Epstein, learned that Breitman had been hospitalized with a serious illness and there was no word about when he might be released.  Epstein decided not to engage new counsel right away, but in early November he telephoned counsel for Academy Glass to tell her about Breitman's illness and that he planned to begin repairing the strip windows in December.  Epstein testified that he was able to reach counsel for Academy Glass directly and relayed both pieces of information to her.  According to Epstein, counsel responded by telling him that he was still being represented by an attorney and that she was not permitted to speak with him, after which she terminated the call.  Epstein concedes that during that brief exchange he did not reveal the scope of the remedial work, the decision to replace rather than repair the strip windows, or the plan to abate the mold.

Counsel for Academy Glass had a different recollection of the telephone call.  She testified that as soon as Epstein identified himself, she told him that she could not speak with him and ended the call.  According to her, Epstein did not tell her that remediation was taking place, had already taken place, or was going to take place.  Epstein did not speak further with representatives for any of the parties or with Breitman.

Early in December 2002, Breitman's son informed plaintiff that Breitman could no longer practice law and that the case files would be transferred to Franzblau Dratch, P.C., Breitman's former law firm. Remediation of the strip-window system began on

December 13, 2002, and was photographed as it progressed by plaintiff and CTSI. Approximately a month later, Epstein met with the attorney at Franzblau Dratch to whom the files had been transferred. During that meeting, plaintiff informed counsel that the remediation project was then in progress and was only two or three weeks away from completion.

Shortly after the files were transferred from Breitman, plaintiff's new counsel filed a motion seeking a voluntary dismissal without prejudice because Breitman's illness had prevented the case from progressing on its normal course. At about the same time, defendants moved to dismiss the complaint for failure to provide discovery. On January 24, 2003, the parties appeared for a hearing on the two motions. At that time, counsel for defendants were alerted that the remediation had begun, but they were not told about the discovery of the mold contamination. Counsel for Academy Glass then requested, in writing, that plaintiff refrain from further remediation pending its evaluation of plaintiff's claims of defective construction and related damage to its building. Because plaintiff believed that it would be impractical, if not impossible, to suspend the partially completed work, counsel advised defendants on January 28, 2003, that it would not halt the remediation.

During the second week of February 2003, counsel for Academy Glass, accompanied by a consultant, visited plaintiff's premises. They found that the strip-window system that Academy Glass had installed had been replaced and that all of the allegedly defective conditions in the building relating to the work performed by Academy Glass had been remediated. Counsel and the consultant were directed to an off-site location where some components of the strip-window system that had been removed were stored in a pile.

According to Epstein, after the strip windows were replaced, the water penetration problem ceased. He further certified that, during and after the window remediation, plaintiff "did not perform any work on any of the other major systems to its building," except for repair work to sections of the EIFS that was needed during the strip-window system replacement.

## B.

Following proceedings not pertinent to the issues on appeal, the parties conducted discovery. On August 24, 2005, Academy Glass filed a spoliation motion, seeking to bar plaintiff from offering any testimony, whether through an expert or otherwise, that related to the installation of the strip-window system, arguing that preclusion was the appropriate remedy.

The trial court conducted an evidentiary hearing late in November 2005, during which both Herbert Cannon, an expert retained by Academy Glass, and Munro, who had been involved both in the inspection and in the remediation project for plaintiff, testified. Cannon had not visited the premises until August 2003, by which time all of the remedial work was finished. He therefore did not have the opportunity to observe the condition of the work that Academy Glass had performed, or to evaluate independently any of the alleged problems with the windows that plaintiff had identified. He testified that, assuming plaintiff had experienced leaks in the building, the photographs taken by plaintiff before and during its repair work were not sufficient for him to form an opinion about whether those leaks were caused by the work performed by Academy Glass.

Cannon explained that, had he been given the opportunity to inspect the window systems, he would have performed several separate tasks to identify the alleged problem and its cause. Those steps would have included a visual inspection to confirm the existence of present or past leaks, a review to determine whether there was any correlation between the leaks and the window components, and systemic water testing of the building to isolate the source of the leaks. He further explained that he was not able to evaluate the claims of mold contamination. He testified that he had not been afforded an opportunity to perform, or to hire a consultant to perform, independent mold testing, and instead had only the information provided by plaintiff's experts concerning the existence and extent of mold.

Cannon testified that there could have been several possible sources of water infiltration other than the windows, including defects in the roof, the EIFS, and the heating and humidity systems in the building, but that he had not been given a chance to evaluate those alternate causes. Cannon asserted that he also had insufficient information to confirm, deny, or dispute the number and extent of any deficiencies in the windows installed by Academy Glass, and could not therefore give an opinion about remediation alternatives that might have been less costly. He conceded, however, that he had never worked with the installation of any strip-window system, including the Kawneer system that was installed by Academy Glass, and that he had not reviewed any literature provided by Kawneer about its strip-window system.

Plaintiff's expert, Munro, testified that before doing any corrective work, several defects in the manner in which Academy Glass had installed the windows were plainly visible. In particular, he explained that the window system requires sill flashing to divert water away from the building, but that Academy Glass had not installed it at all. He pointed out that Academy Glass had used sill extensions instead of flashing, that the sill extensions were lapped rather than butted, that the expansion mullions that should have been placed every twenty feet were missing or not visible, that many gaskets were improperly installed, and that the windows had been improperly caulked. In addition, in his expert report and in his testimony, he noted that Academy Glass had used window frames that were too large and that were neither manufactured by Kawneer nor designed to accommodate the strip-window system. Each of these defects in the installation had either sealed off the weeping system, or had interfered with the route designed to permit weeping, which allowed water to infiltrate and become trapped in the walls, causing the leaks. Based on his visual inspection, which he documented with photographs, he concluded that, as initially installed, the window system was retaining water and that it was possible that excessive moisture was also collecting on the inside mullions.

Munro conceded that he did not photograph every window and therefore did not document through photographs each and every one of the defects noted in his expert report. He also acknowledged that after the remediation was completed one could not independently verify which of the defects he noted had caused the water infiltration, whether and to what extent the caulking had been deficient, and whether and to what extent expansion mullions or the sill extensions had contributed to the water infiltration. He further conceded that the particular components that he blamed for the water infiltration, including the gaskets, sill extensions, and caulking, were removed during the remediation and had not been preserved. He also conceded that a portion of the EIFS that abuts the windows was repaired, so that its effect, if any, on the leakage, could not be independently verified.

## C.

On March 21 and 22, 2006, the trial court separately granted defendants' motions to exclude evidence relating to the window system installation. In reaching that conclusion, the court found that plaintiff had never given notice to defendants about the proposed remediation prior to the commencement of the work; had failed to respond to defendants' initial requests to conduct an inspection; had first notified defendants of the remediation work on January 24, 2003, when there was insufficient time to permit them to perform an independent investigation; and had completed the repairs when there was no real emergency.

The trial court concluded that plaintiff had engaged in spoliation of the evidence and that there was clear prejudice to defendants because their expert had not been given an opportunity to fully investigate the leaks and their cause. The court also concluded that the expert's photographs and his records about his visual observations were not sufficient[3] to permit defendants to secure an expert opinion contrary to that offered on plaintiff's behalf.

---

[3] As part of the written Findings of Facts and Conclusions of Law, the court commented that plaintiff's expert had conceded that the photographic evidence

In fashioning an appropriate remedy, the court concluded that monetary sanctions or an adverse inference charge would be insufficient and ineffective, but also rejected defendant's request for dismissal of the complaint as being too extreme. Instead, the motion court decided to ameliorate the prejudice by barring plaintiff's experts from giving any opinion testimony against defendants, reasoning that this approach would create a level playing field for the parties.

In April 2006, Academy Glass moved for summary judgment, arguing that because plaintiff was precluded from offering expert testimony, it could not prevail. Shortly thereafter, Tri–Form cross-moved for partial summary judgment [4] on all window-related claims. On May 26, 2006, the trial court granted both motions. The court concluded that plaintiff's window system claims required expert proofs both as to liability and damages and that the preclusion order prevented plaintiff from offering those proofs. In addition, the court rejected plaintiff's alternate *res ipsa loquitur* argument because plaintiff could not demonstrate that the instrumentality at issue was within defendants' exclusive control and could not exclude all other possible causes of the water infiltration. The effect, therefore, of the motion court's earlier effort to "level the playing field" was that the evidence plaintiff was permitted to utilize had been so limited that it could not sustain its burden of proof.

Plaintiff appealed, conceding that there had been spoliation and that defendants were entitled to a remedy, but contending that the

---

of the windows was inadequate to serve as a basis for defendants to determine the cause of the leaking. That finding, however, is not supported by the record. Plaintiff's expert certainly conceded that he did not photograph every window, but that does not equate with a concession that his photographs were inadequate to permit defendants' experts to reach conclusions about whether there were deficiencies visible in those photographs and whether those deficiencies caused the leaks.

[4] Because Tri–Form served as the construction manager for the project, it was implicated in other claimed defects which, although not relevant to this appeal, required its motion to be limited to the window-related claims.

remedy of preclusion and dismissal was unnecessarily harsh. In an unpublished opinion, the Appellate Division reversed and remanded, concluding that, under the circumstances, the trial court's order precluding plaintiff from offering any and all expert testimony was neither just nor reasonable. Because spoliation was conceded, the panel focused only on the appropriate remedy.

The panel began by rejecting defendants' assertion that plaintiff's spoliation had effectively destroyed all potentially relevant evidence. Noting that Academy Glass had been afforded and had taken advantage of multiple opportunities to inspect the windows during the two years when plaintiff was complaining about leaks, the panel observed that it could have taken photographs or otherwise documented the conditions its personnel observed and on which it could have relied. Of even greater significance to the panel was the fact that Academy Glass, as the installer of the strip-window system, enjoyed superior knowledge about the manner in which it did so, and presumably has other evidence on which it can rely, including shop drawings, documentary evidence of its work, and other information it can gather from its employees who performed the work.

Fashioning relief that it considered to be fair to all parties, the panel concluded that the proper remedy would be to limit plaintiff's expert proofs to those based only on evidence obtained and observations made prior to the disassembly of the windows and the remediation. That limitation would permit defendants to engage an expert who could rely on that evidence and other evidence in their control to rebut plaintiff's expert.

The panel concluded by noting that "the prejudice from the spoliation will be adequately cured by confining the evidence and expert testimony respecting the condition of the windows to the period of time preceding the disassembly of the lunchroom window." By extension, the panel effectively precluded any evidence relating to the mold claim,[5] because it was a condition that was not

---

[5] For similar reasons, because the panel's approach effectively precluded plaintiff from proceeding with any claim relating to the curtain-wall window system, plaintiff withdrew those claims.

discovered, and was neither apparent nor observable, until after the windows were disassembled. The panel therefore reversed the summary judgment order and remanded the matter to the trial court for further proceedings.

Defendants Academy Glass and Tri–Form and plaintiff all filed petitions for certification. This Court granted the petitions for certification filed by defendants, limited to the extent of the remedy available on the spoliation claim, 197 *N.J.* 477, 963 *A.*2d 846 (2009), and denied plaintiff's petition for certification in its entirety. *Ibid.*

## II.

Defendant Academy Glass urges this Court to reverse the Appellate Division's judgment. It argues that the panel's decision creates an unreasonable burden on contractors who are called to a customer's premises in response to a complaint, because it essentially requires them to anticipate future litigation, forcing them to conduct a thorough inspection and to document conditions they find with that in mind. Second, Academy Glass argues that the Appellate Division failed to give appropriate deference to the motion court's findings rejecting plaintiff's proffered excuse that the remediation was necessitated by emergency. Third, Academy Glass contends that the Appellate Division failed to recognize that the spoliation prevents it from being able to challenge plaintiff's contentions and from demonstrating either an alternate cause for the leaks or that a less expensive repair alternative existed.

Defendants Tri–Form and Karabinchak essentially echo the arguments made by defendant Academy Glass, but point out that they, unlike defendant Academy Glass, were never called back to plaintiff's premises about the leaks. They assert that because they had no opportunity to inspect the alleged defects, the remedy crafted by the Appellate Division is unfair to them.

Plaintiff urges this Court to affirm the appellate panel's judgment. First, plaintiff argues that because the spoliation was not intentional, but was essentially the result of negligence on the part

of its former counsel, and because the prejudice to defendants is relatively insignificant, the Appellate Division correctly concluded that the trial court's sanction of dismissal was too harsh. Second, plaintiff argues that the panel's decision does not hinder defendants' ability to present a defense to liability or damages, because plaintiff's claim is confined to visible conditions observable before the remediation began. Plaintiff contends that there is sufficient evidence in the record, in defendants' own documents, and available through lay and expert testimony, to permit defendants to fairly defend against its claims.

### III.

This appeal requires us to consider whether the sanction of dismissal, ordered by the trial court, or of partial preclusion of expert evidence, fashioned by the appellate panel, was appropriate to remedy plaintiff's conceded spoliation of evidence. That question principally requires a review and evaluation of the numerous sanctions that we have agreed may be imposed upon a spoliator. As this particular dispute illustrates, however, the selection of the appropriate sanction also involves considerations unique to commercial construction projects, in which alternative sources of information relevant to the questions of liability and damages may impact upon the evaluation of which sanction is the appropriate one.

### A.

We begin by reciting briefly the now-familiar principles surrounding spoliation and the remedies available to courts to deal with it. In doing so, however, we need not trace the entire "history of spoliation in our courts," an exercise in which we have engaged recently. *Tartaglia v. UBS PaineWebber Inc.*, 197 *N.J.* 81, 116, 961 *A.2d* 1167 (2008). Instead, we need only reiterate the essential principles that have developed over time and that guide courts in evaluating the appropriate method for addressing any particular act of spoliation.

First, to a great extent our traditional approach to spoliation begins with identifying the spoliator, because that, in and of itself, will impact on the available and appropriate remedies. *Id.* at 119–20, 961 *A.*2d 1167. For example, if the spoliator was a defendant, courts initially were empowered to permit plaintiff to pursue a separate claim for fraudulent concealment of evidence. *See Viviano v. CBS, Inc.,* 251 *N.J.Super.* 113, 125–26, 597 *A.*2d 543 (App.Div.1991), *certif. denied,* 127 *N.J.* 565, 606 *A.*2d 375 (1992). We have also concluded that a separate claim may be appropriate if the spoliator is not a party to the litigation, as when an attorney's recklessness caused the loss of evidence. *See Jerista v. Murray,* 185 *N.J.* 175, 203, 883 *A.*2d 350 (2005) (permitting plaintiff to pursue spoliation theory in attorney malpractice claim). *But see Hewitt v. Allen Canning Co.,* 321 *N.J.Super.* 178, 184–85, 728 *A.*2d 319 (App.Div.) (rejecting defendant's effort to pursue third-party claim against plaintiff's attorney who discarded can of spinach claimed to have contained insect), *certif. denied,* 161 *N.J.* 335, 736 *A.*2d 528 (1999). We have expanded the remedies available to courts dealing with spoliating defendants by permitting the use of discovery sanctions and adverse inferences, *see Rosenblit v. Zimmerman,* 166 *N.J.* 391, 401–03, 411, 766 *A.*2d 749 (2001), and have allowed the courts to employ a bifurcated trial technique to address spoliation, *see id.* at 407–08, 766 *A.*2d 749. We have also authorized courts to use more than one such remedy if circumstances warrant it. *See Tartaglia, supra,* 197 *N.J.* at 122, 961 *A.*2d 1167.

If, on the other hand, the spoliator is a plaintiff, the remedy of a separate cause of action for fraudulent concealment would not necessarily serve any purpose. *See Hirsch v. Gen. Motors Corp.,* 266 *N.J.Super.* 222, 245, 628 *A.*2d 1108 (Law Div.1993) (noting that goal of "protect[ing] a litigant's interest [through] a prospective cause of action" does not apply when spoliation interferes with defendant's ability to defend lawsuit). In that circumstance, courts turned to preclusion of plaintiff's evidence that had been, or could have been, derived from the spoliated material or item as the appropriate sanction. *Id.* at 266, 628 *A.*2d 1108. That remedy

essentially proceeded upon the premise that the plaintiff's opportunity to evaluate or test the underlying material or item prior to its destruction gave it an unfair advantage that could not be duplicated. *Id.* at 264, 628 *A.*2d 1108.

Second, we have observed that selecting the appropriate remedy for spoliation depends in part on the timing of when the act of spoliation is discovered. *See Tartaglia, supra,* 197 *N.J.* at 120, 961 *A.*2d 1167; *Rosenblit, supra,* 166 *N.J.* at 407–08, 766 *A.*2d 749. Spoliation that becomes apparent during discovery or trial often can be addressed effectively through the use of ordinary discovery sanctions, such as preclusion, or through adverse inferences. *Rosenblit, supra,* 166 *N.J.* at 401–02, 766 *A.*2d 749. Spoliation that is not discovered until after there has been a verdict in the case in chief, however, will generally result in a "cause of action for the fraudulent concealment [that] will be entirely separate and, depending on the outcome of the original trial, may include both consideration of the substantive counts as well as the further spoliation-based damages." *Tartaglia, supra,* 197 *N.J.* at 121, 961 *A.*2d 1167.

Third, although most of the published decisions relating to spoliation focus on the available remedies, selecting the one that is appropriate under the circumstances must be guided by the essential purposes that all of the sanctions are designed to achieve. As we have observed, the spoliation sanction serves three goals: "to make whole, as nearly as possible, the litigant whose cause of action has been impaired by the absence of crucial evidence; to punish the wrongdoer; and to deter others from such conduct." *Rosenblit, supra,* 166 *N.J.* at 401, 766 *A.*2d 749. Put another way, the focus in selecting the proper sanction is "evening the playing field," *ibid.,* or rectifying the prejudice caused by the spoliation so as to "place[ ] the parties in equipoise," *Hirsch, supra,* 266 *N.J.Super.* at 266, 628 *A.*2d 1108. Achieving those sometimes competing goals calls for careful evaluation of the particular facts and circumstances of the litigation, in order that

the true impact of the spoliated items can be assessed and an appropriate sanction imposed.

### B.

This appeal raises the question of whether the trial court's preclusion of evidence, the effect of which was to require dismissal of plaintiff's claim in its entirety, or the lesser remedy fashioned by the Appellate Division, which limited plaintiff's expert proofs to those conditions observable before the building remediation began, was the appropriate sanction for plaintiff's spoliation.

We have long recognized the severity of dismissal, observing that because it is "the ultimate sanction[,] . . . [we have] struck a balance by instructing courts to impose [it] 'only sparingly.'" *Abtrax Pharm., Inc. v. Elkins–Sinn, Inc.,* 139 *N.J.* 499, 514, 655 *A.*2d 1368 (1995) (quoting *Zaccardi v. Becker,* 88 *N.J.* 245, 253, 440 *A.*2d 1329 (1982)). That is, "it will normally be ordered only when no lesser sanction will suffice to erase the prejudice suffered by the non-delinquent party." *Zaccardi, supra,* 88 *N.J.* at 253, 440 *A.*2d 1329.

Our admonition concerning the circumstances in which the harsh and draconian remedy of dismissal may be used has guided courts grappling with spoliation claims as well. Our Appellate Division has been reluctant to order dismissal as a sanction for spoliation even when the dispute's principal evidence has been destroyed and even if its loss has impeded the preparation of a defense. *See Hirsch, supra,* 266 *N.J.Super.* at 266–67, 628 *A.*2d 1108 (denying motion to dismiss; ordering preclusion of expert report and testimony based on expert's inspection of automobile that was subsequently lost).

The Appellate Division has ordered dismissal of a claim when the more limited, but appropriate, remedy of preclusion would effectively deprive the spoliator of its ability to present needed expert proofs. *See Aetna Life & Cas. Co. v. Imet Mason Contractors,* 309 *N.J.Super.* 358, 369–70, 707 *A.*2d 180 (App.Div.1998).

Even in that context, however, the court referred to dismissal as "a remedy of last resort." *Id.* at 369, 707 *A.*2d 180. The court found it appropriate nonetheless in circumstances in which a party inspected damaged property that was thereafter destroyed, gave no opportunity whatsoever to its adversary to perform an inspection, and in which the inspection itself was the sole basis for its expert report. *Id.* at 367–69, 707 *A.*2d 180. Although simple preclusion of the expert report was the court's preferred sanction, that lesser remedy was not workable as a practical matter, because the spoliating party conceded that the natural consequence of preclusion of its expert was that it could not prove its case. In those circumstances, the panel concluded that it had no option but to affirm the trial court's dismissal order. *Id.* at 369–70, 707 *A.*2d 180.

Spoliation arising in the context of construction defect claims has also been addressed by our Appellate Division. *See Manor-Care Health Servs., Inc. v. Osmose Wood Preserving, Inc.,* 336 *N.J.Super.* 218, 764 *A.*2d 475 (App.Div.2001). Because of the similarities between that matter and the pending dispute, our explanation of the court's analysis is detailed. In *ManorCare,* the court considered the appropriate sanction to impose on a commercial building owner that removed and discarded deteriorating fire retardant treated (FRT) plywood while litigation was pending against two different FRT plywood manufacturers. *Id.* at 221–22, 764 *A.*2d 475. Prior to the remediation, both manufacturers had been given an opportunity to inspect the allegedly deteriorating FRT plywood, and all of the parties had documented the conditions that were observed in reports and representative photographs. *Id.* at 223–24, 764 *A.*2d 475. In spite of a promise that no remediation would take place except on notice to the manufacturers, the FRT plywood was removed and the percentage of FRT plywood attributed to each manufacturer was estimated. *Id.* at 225, 764 *A.*2d 475. After the FRT plywood was removed, most of it was discarded, although the building owner's expert saved several pieces that were purported to be "representative" samples. *Id.* at 225–26, 764 *A.*2d 475.

Although the trial court in *ManorCare* had concluded that dismissal of plaintiff's complaint against the manufacturers was the only effective remedy for plaintiff's spoliation, the appellate panel disagreed. Recognizing that published decisions limited the circumstances in which dismissal should be ordered, *id.* at 231, 764 *A.*2d 475 (quoting *Aetna, supra,* 309 *N.J.Super.* at 365, 707 *A.*2d 180), the appellate panel concluded that such an extreme sanction was not warranted, *see id.* at 236, 764 *A.*2d 475 (determining preclusion as appropriate sanction).

Judge Newman, writing for the panel, reasoned that the more limited sanction of precluding evidence would be effective to "level the playing field." *Ibid.* He explained that all parties had inspected the premises, that the evidence of the conditions had been visible during the inspections, and that each party therefore could rely on an expert whose opinion would be based on those documented conditions. *See id.* at 233, 764 *A.*2d 475 (noting that defendants obtained evidence through inspection before repairs). At the same time, the court concluded that any evidence developed during the repairs and renovation, because it had not been made equally available to defendant, would be excluded. *Id.* at 236, 764 *A.*2d 475. As Judge Newman put it, this approach would "return each party to the position it occupied prior to the commencement of the roof repairs." *Ibid.*

In reaching this result, the panel considered not only previously-published spoliation decisions, but looked to precedents addressing the appropriate sanctions that the court may impose for discovery violations. *Id.* at 235, 764 *A.*2d 475. Guided by all of those decisions, the court created a specifically tailored remedy that took into account the facts available to both parties, the opportunity provided to the manufacturer to inspect, the information both parties derived or could have derived prior to the spoliation, as well as the existence of reports, records, and photographs of those pre-remediation conditions. *Id.* at 233–36, 764 *A.*2d 475.

The court in *ManorCare* attempted to create a level playing field by limiting plaintiff to whatever could fairly be derived from those proofs. In doing so, the court did not excuse or condone spoliation, but concluded that dismissal of the entire complaint would be unnecessarily harsh. Instead, it recognized that preclusion, by depriving plaintiff of significant other data and limiting its ability to recover, would be a fair and practical remedy. *Id.* at 236, 764 *A.*2d 475.

## C.

Courts in other states, and a few federal courts, have addressed issues relating to spoliation that have arisen in a variety of factual circumstances. Many of those courts have been motivated by a concern, similar to ours, about the harshness of dismissal and the need to find an appropriate remedy that will balance the rights of the parties. *See, e.g., West v. Goodyear Tire & Rubber Co.,* 167 *F.*3d 776, 779–80 (2d Cir.1999) (discussing "drastic" nature of outright dismissal); *Rimkus Consulting Group, Inc. v. Cammarata,* 688 *F.Supp.*2d 598, 618–19 (S.D.Tex.2010) (explaining sanctions less extreme than dismissal are appropriate when party is not irreparably prejudiced); *Roskam Baking Co. v. Lanham Mach. Co.,* 71 *F.Supp.*2d 736, 749 (W.D.Mich.1999) (applying Michigan law; commenting on harshness of dismissal as remedy).

Some courts have taken a restrictive view of what spoliation is, and have limited sanctions to cases in which evidence was willfully or intentionally destroyed. *See, e.g., Mayes v. Black & Decker (U.S.), Inc.,* 931 *F.Supp.* 80, 83 (D.N.H.1996) (concluding that absence of evidence of egregious behavior made dismissal inappropriate); *Hendricks v. Great Plains Supply Co.,* 609 *N.W.*2d 486, 491 (Iowa 2000) (rejecting use of adverse inference in dispute about cause of fire based on opportunity for inspection, existence of photographs, and absence of bad intent); *Farrell v. Connetti Trailer Sales, Inc.,* 727 *A.*2d 183, 187 (R.I.1999) (holding that broad preclusive sanction is unwarranted absent "bad faith or willful destruction of this evidence"). In those jurisdictions, the

sanction imposed for spoliation has been short of dismissal. *See Tancrelle v. Friendly Ice Cream Corp.*, 756 A.2d 744, 748–49 (R.I.2000) (concluding that adverse inference was appropriate when restaurant prevented workman's representative from photographing stairs on which he fell, then removed and replaced stairs without notice).

Some courts have attempted to devise a framework within which appropriate remedies for spoliation in the construction litigation context can be determined. The Supreme Court of Wisconsin, for example, has relied on a totality of the circumstances approach. *See Am. Family Mut. Ins. Co. v. Golke*, 319 *Wis.*2d 397, 768 *N.W.*2d 729, 738 (2009). In offering guidance about the application of that approach, the court identified relevant considerations, including the length of time the evidence can be kept, who owns the evidence, the degree of prejudice caused by its destruction, the form of notice, the parties' sophistication, and the burden of preserving the evidence. *Ibid.* As part of its analysis, the court explained that "dismissal as a sanction for spoliation is appropriate only when the party in control of the evidence acted egregiously in destroying that evidence," *id.* at 740, and defined egregious behavior as "a conscious attempt to affect the outcome of the litigation, or a flagrant, knowing disregard of the judicial process." *Ibid.* (quoting *Milwaukee Constructors II v. Milwaukee Metro. Sewerage Dist.*, 177 *Wis.*2d 523, 502 *N.W.*2d 881, 884–85 (Wis.Ct.App.), *rev. denied*, 508 *N.W.*2d 421 (Wis.1993)).

The United States Court of Appeals for the Third Circuit has devised a three-part test to be used generally in determining the appropriate sanction for spoliation. *See Schmid v. Milwaukee Elec. Tool Corp.*, 13 *F.*3d 76, 79 (3d Cir.1994). The *Schmid* test involves an inquiry into the spoliator's degree of fault, the prejudice caused to the other party, and the availability of lesser sanctions that will both avoid unfairness to the non-spoliator and deter future acts of spoliation. *Ibid.* In *Schmid*, the court considered spoliation in the context of an electric saw that "kicked back" and caused an injury to a workman. *Id.* at 77. Plaintiff's expert,

in inspecting the saw, disassembled it and found debris inside, which he opined was the cause of the accident. *Ibid.* Although he photographed that debris, and did not reassemble the saw before sending it to the manufacturer's expert, the debris was discarded. *Id.* at 77–78. In those circumstances, the Third Circuit concluded that dismissal was too harsh. *Id.* at 80.

It was significant to the *Schmid* court that the plaintiff's claim was based on a design defect theory, and that the expert's opinion was that the guard mechanism on the saw was defective because it permitted debris to get in. *Ibid.* Even though the debris itself was destroyed, therefore, the prejudice to defendant was considerably less than might otherwise be the case. *Ibid.* Addressing its three factors, the court concluded that there was no suggestion that the expert acted egregiously or out of ill will, there was sufficient evidence to fairly try the design defect claim, and dismissal would have been unfair to the plaintiff. *Id.* at 80–81. Because lesser sanctions would enable the trial court to proceed, the harsh sanction of dismissal was inappropriate. *Id.* at 81.

In a case involving a claimed construction defect, the Supreme Court of Alabama has devised a five-factor test for spoliation. *Story v. RAJ Props., Inc.,* 909 So.2d 797, 802–03 (Ala.2005). That test requires the court to consider: "(1) the importance of the evidence destroyed; (2) the culpability of the offending party; (3) fundamental fairness; (4) alternative sources of information obtainable from the evidence destroyed; and (5) the possible effectiveness of other sanctions less severe than dismissal." *Ibid.* (citing *Vesta Fire Ins. Corp. v. Milam & Co. Constr., Inc.,* 901 So.2d 84, 94–95 (Ala.2004)).

The Alabama case involved a homeowner's claim against the manufacturer of EIFS that was alleged to be defective. Applying its five-factor test, the court affirmed the grant of summary judgment in defendant's favor, because an inspection of the EIFS was essential to the preparation of a defense, defendant had been given no opportunity to inspect in advance of the repairs, and the photographs were insufficient to demonstrate the condition of the

EIFS prior to removal. *Id.* at 804–05. The court found the third factor in its test to be particularly compelling, commenting that permitting plaintiff to proceed would be fundamentally unfair because plaintiff kept enough evidence to prove its case while destroying other evidence in an effort to prevent the EIFS manufacturers from being able to mount a defense. *Id.* at 805.

## IV.

Although the three-part test announced in *Schmid* and the five-part test devised by the Supreme Court of Alabama are useful guides, neither is sufficiently precise, in our view, to focus courts on the questions that continually arise in construction defect litigation. As this appeal makes plain, the competing concerns of the various parties involved in such disputes, the frequent need to effect a timely resolution to a problem in a building, and the records that generally are kept in the course of such projects, all bear on the test that should be applied. The record before the Court in this dispute provides us with an opportunity to address how courts should devise an appropriate sanction.

In selecting the appropriate sanction for an act of spoliation, we agree that the three factors identified by the court in *Schmid* are important considerations, but they are not the only ones. Therefore, in evaluating "the degree of fault of the party who altered or destroyed the evidence," *Schmid, supra,* 13 *F.*3d at 79, courts must also consider the identity of the spoliator, because we have noted that there may be different methods of addressing spoliation depending on whether it was caused by a plaintiff, defendant, or third party. Moreover, the manner in which the spoliation occurred, the reason why it occurred, and the timing of its occurrence are important considerations as well, because spoliation may occur in the context of construction litigation if the defective component threatens the integrity of a building.

Similarly, the second *Schmid* factor, focusing on "the degree of prejudice suffered by the opposing party," *ibid.,* also requires expansion. Evaluating prejudice in the context of commercial

construction projects requires an appreciation for the vast array of alternate sources of information that such projects generally provide, all of which may serve to diminish any prejudice. Commercial construction projects usually yield a great wealth of information, both through the regularly kept records of the participants in the project and through their on-site personnel. Moreover, such projects generally involve multiple sources where the same or similar information can be found. For example, in projects of this type, there ordinarily will be plans and specifications, shop drawings and as-builts, purchase orders for materials and supplies, job logs, meeting minutes, and time records maintained by personnel employed by the participants. Often there also will be photographs or videotapes of the project as it progresses. As part of the regular course of business in the construction industry, most of those materials will be maintained in more than one place, thus increasing the likelihood that they will be available in some form and from some source. The ordinary business practices in commercial construction projects therefore lend themselves to creative ways of leveling the playing field if something is lost.

Courts evaluating prejudice should also recognize that the non-spoliating party may bear some of the responsibility for the loss of the evidence. A contractor, for example, that is called back to the building repeatedly but that merely glances at the work and makes little effort to identify a cause, to document the conditions observed, or to effect a solution will have less ground to complain when the owner seeks assistance from others.

Similarly, the third *Schmid* factor, that is, the availability of a lesser sanction that will serve the purposes of reducing the unfairness to the innocent party and of deterring future misconduct, also requires expansion. Certainly because of the wealth of other evidence and alternate proofs available in commercial construction litigation, there will often be ways in which the prejudice or unfairness to the non-spoliating party can be diminished or overcome.

■ In summary, courts confronted with spoliation in the context of commercial construction litigation should recognize that a variety of factors bear on the appropriate remedy. In particular, courts should consider all of the following: the identity of the spoliator; the manner in which the spoliation occurred, including the reason for and timing of its occurrence; the prejudice to the non-spoliating party, including whether the non-spoliating party bears any responsibility for the loss of the spoliated evidence; and the alternate sources of information that are, or are likely to be, available to the non-spoliator from its own records and personnel, from contemporaneous documentation or recordings made by or on behalf of the spoliator, and from others as a result of the usual and customary business practices in the construction industry. Courts should then balance all of those considerations in crafting the appropriate remedy with an appreciation for the ways in which the construction industry itself provides them with unique tools with which to "level the playing field" and achieve an appropriate remedy for spoliation.

■ In the construction litigation context, it will often be the case that a sanction for spoliation other than dismissal will achieve our traditional goals, which are "to make [the non-spoliating party] whole, as nearly as possible, . . . to punish the wrongdoer; and to deter others from such conduct." *Rosenblit, supra,* 166 *N.J.* at 401, 766 *A.*2d 749. Identifying the appropriate sanction, however, entails utilizing all of the means at the court's disposal to effect a just result. Those means include, of course, all of the remedies that we have traditionally recognized, but they are not limited to adverse inferences, bifurcated proceedings, preclusion of evidence, and dismissal. Instead, they might also include, as here, limitation of claims to only those that can be tried fairly, with dismissal of others, or an award of costs caused by the spoliation, if the costs can be quantified and assessed against the offending party.

■ Balancing all of those factors, the court must then carefully weigh what sanction is the appropriate one, choosing the approach that imposes a sanction consistent with fundamental

fairness to both parties. To be sure, if the court concludes that a spoliator has acted intentionally and in bad faith, seeking to preserve only evidence that assists it and to destroy any evidence that would harm its position, a harsh sanction will be appropriate. But even in those circumstances, if it is possible to return the parties to the status quo ante, or to limit the claims to those that can be tried fairly, the court may elect to address egregiousness through imposition of one of the sanctions ordinarily used for discovery violations. *See, e.g., R.* 4:23–1(c) (allowing award of expenses for motion to compel); *R.* 4:23–2(b) (listing sanctions for failure to comply with discovery order).

Commercial construction litigation presents both the unique competing concerns that we have described and the opportunity to carefully craft a remedy for spoliation that effectively matches the cure with the wrongful act. That is not to say that we in any way condone spoliation, rather it is to say that dismissal will often not be the appropriate sanction. The dispute in this case is illustrative. To start, plaintiff's spoliation has already cost it the ability to pursue its mold and curtain wall claims, neither of which can proceed based on the fairly available evidence and both of which it has withdrawn, leaving the strip-window system as the only viable basis for a claim. Regardless of how that claim would have been tried had defendants been involved throughout the process of removing and replacing the strip windows, even after plaintiff's spoliation of the evidence, the strip-window claim can proceed. It is, however, a claim that now is limited to the conditions that would have been observable when defendant Academy Glass was called back to address the leaking windows. Moreover, it is limited to what the photographs and documents contemporaneously maintained by the parties and others reveal.

For example, plaintiff contends that the leaks were the result of the failure to install a sufficient number of mullions, the failure to install the required sill flashing, the improper installation of sill extensions, and the use of window frames not approved by Kawneer. Not only are those conditions that would be apparent

during a visual inspection, but they are claims that the window installer should be able to defend by relying on its own documents and personnel. That is because the window installer either purchased the correct number of mullions, sill extensions, and window frames or it fabricated them itself, but in either case the supporting documents or testimony from its personnel should be within its possession. Moreover, to the extent that the Kawneer strip-window system requires the use of other Kawneer components, the window installer either obtained those specified components or it did not, and in either event sufficient information to demonstrate whether it did so should be within its control.

Our purpose is not to create a catalog of the many possibilities that may occur in commercial construction projects and the ways in which they may be pursued or may be lost due to spoliation, but to use this case as an illustration of how courts can address it both fairly and creatively. It will not always be possible to recreate the evidence that has been lost or to limit the claims so as to be fair to the non-spoliating party. In those circumstances, the severe sanction of dismissal may indeed be appropriate. Moreover, even after the claims are limited and the matter can fairly proceed, it will still be within the court's power to utilize other sanctions against the spoliator through the use of an adverse inference or the imposition of monetary sanctions designed to shift costs to the spoliator.

We leave it to the sound discretion of the trial courts to make those decisions as justice requires. In the end, courts faced with spoliation claims should strive to impose a remedy that will serve the ends of justice by creating a level playing field, by ensuring that the consequence of the lost evidence falls on the spoliator rather than on an innocent party, and by using their considerable powers to deter future acts of spoliation.

In this dispute, plaintiff has already lost claims as a result of the spoliation and its claim relating to the strip-window system has been limited significantly. There remains, however, one further step in our analysis, because defendants are not

similarly situated. As to defendant Academy Glass, we agree with the Appellate Division that there is a sufficient basis on which to permit plaintiff to proceed, limiting its claims to the conditions that were observable prior to remediation and its experts to a review of only those conditions.

However, we reach a different result as to defendants Tri–Form and Karabinchak. In spite of the fact that the wealth of evidence ordinarily generated during construction projects lends itself to leveling the playing field, in this case the opportunity to inspect the leaking windows before remediation was critical. Because plaintiff deprived defendants Tri–Form and Karabinchak of that opportunity, and because we therefore perceive them to have no independent source of evidence or testimony sufficient to permit them to mount a defense, the claims as to those defendants cannot proceed at all. As to defendants Tri–Form and Karabinchak, the only fair remedy for plaintiff's spoliation is to impose the sanction of dismissal.

## V.

The judgment of the Appellate Division is affirmed as it relates to defendant Academy Glass and reversed as it relates to defendants Tri–Form and Karabinchak and the matter is remanded to the Law Division for further proceedings.

*For affirmance/reversal/remandment*—CHIEF JUSTICE RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO, and HOENS—7.