**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3194-18T2

TYLER J. HATFIELD,

    Plaintiff-Appellant,

v.

FCA US LLC,

    Defendant-Respondent.

_____

Argued January 9, 2020 – Decided June 3, 2020

Before Judges Nugent and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Docket No. L-0287-18.

Jason Greshes argued the cause for appellant (Kimmel & Silverman, PC, attorneys; Shannon Ray Harkins and Robert M. Silverman, on the brief).

Walter F. Kawalec, III argued the cause for respondent (Marshall Dennehey Warner Coleman & Goggin, attorneys; Walter F. Kawalec, III, on the brief).

PER CURIAM

This is a Lemon Law case. The trial court granted defendant FCA US LLC's motion to dismiss the complaint with prejudice due to plaintiff Tyler J. Hatfield's alleged spoliation of evidence. The court based its opinion on evidence obtained in violation of the attorney-client privilege, on representations made by defense counsel at oral argument unsupported by defendant's expert, and on the unsupported supposition the vehicle that was the alleged lemon was no longer available for inspection by defendant's expert. Plaintiff appeals. We vacate the order of dismissal and remand for further proceedings.

I.

Plaintiff's Purchase of the Vehicle and its Repair History

The pleadings and evidence on the motion record disclose the following facts. Defendant manufactured the 2013 Fiat 500 Sport that plaintiff purchased as a certified pre-owned vehicle from Fiat of Maple Shade (the "Dealership"). Plaintiff purchased the Fiat on January 6, 2017. The total sales price was $15,086.20. The Fiat had 41,326 miles on its odometer. It came with a standard "6-year/80,000-Mile" warranty. According to the complaint, "[t]he parties' bargain includes an express 3-year/36,000 mile warranty." The Fiat began

A-3194-18T2

having problems the month after plaintiff purchased it. He took the car to the Dealership for repairs four times within the next ten months.

The first time, February 23, 2017, the month after plaintiff purchased the Fiat, he noticed the check engine light was on. The Dealership repair record states: "Correction[:] reflash lates [sic] updates." Three months and three days later, on May 26, 2017, plaintiff returned because the check engine light was on again. The Dealership repair record states: "Cause[:] vehicle needs new purge valve and purge hose." The repair record further states: "Correction[:] valve in stock and hose will need to be ordered—5-10 busy [sic] days."

One month later, on June 27, 2017, plaintiff returned a third time due to problems with the moonroof. The Dealership repair record states: "Concern[:] Customer states moonroof not operating properly." The record identifies the cause as "broken left side guide on moonroof" and the correction as "replace guide and repair tracksublet to autosunroof."[1]

Less than five months later, on November 13, 2017, plaintiff returned for a fourth time because the check engine light had come on again. The Dealership record states the cause as "evap code" and the repair as "replaced evap fuel vent line."

---

[1] The parties use the terms "moonroof" and "sunroof" interchangeably.

A-3194-18T2

<u>Discovery and the Fiat's Resale to the Dealership</u>

Plaintiff filed his complaint on February 7, 2018. Defendant answered on April 2, 2018, and included in its answer a demand for "an inspection of the vehicle in question pursuant to N.J.R. 4:18-1," as well as "the right to observe any inspection conducted by an expert utilized by [p]laintiff." The court issued a track assignment notice that provided for 150 days of discovery, with an end date of August 30, 2018. The parties, by consent, extended the discovery end date to October 29, 2018.

In April 2018, plaintiff notified defendant that "an inspection has been scheduled in the above matter for 6/5 @ 1pm at the address below[.]" The inspection proceeded as scheduled at the designated address.

Both parties had experts present: Scot Turner, a Master Automobile Technician and Certified Professional Estimator for plaintiff, and Henry Gill, a mechanical expert for defendant. Turner averred in an affidavit: "I know Mr. Gill from my regular interactions with him in his capacity as a mechanical expert and representative of [defendant]. . . . It is commonplace for Mr. Gill to attend inspections on behalf of [defendant]. . . ." According to Turner, Gill was present for the entire inspection and test drive of the vehicle. In his July 25, 2018 report—which [defendant] acknowledges receiving—Turner explained that

<span>A-3194-18T2</span>

when he inspected the vehicle he "scanned the vehicle for diagnostic trouble codes and found code P1CEA00 for Boost Side EVAP Purge System Performance." He also examined the sunroof.

In his report, before summarizing the Dealership's excuses for the ongoing delay in obtaining the parts needed to repair the Fiat's "evap system," plaintiff's expert recounted the Fiat's repair history. According to the report, the Fiat "was originally put into service on October 30, 2012." The report continues: "Chrysler warranty records show that prior to it being sold to [plaintiff] as a Fiat Certified Pre-Owned vehicle, repairs were made for the same defects he experienced with it after purchasing it including repairs to the evaporative emission control system and the sunroof track." The report enumerates and describes the repairs to the vehicle made before plaintiff bought it. These repairs were made in April 2015, October 2016, and December 2016, with the last repair being made sixteen days before plaintiff purchased the Fiat from the Dealership.

Among other opinions, Turner concluded that as a result of the Dealership's failure to remedy the Fiat's problems and defendant's failure to honor its warranties, the Fiat's use and value were "substantially impaired." He further concluded the Fiat had diminished in value by 23.1 percent of the purchase price. The report states in pertinent part:

A-3194-18T2

The purchaser of a manufacturer's certified pre-owned vehicle has the assurance of the manufacturer that it has been thoroughly inspected by its authorized dealer prior to sale and any faults have been corrected. The manufacturer also assures the purchaser that its authorized dealers have the training, technical information, factory assistance and tools to properly service the vehicle. With these assurances, the purchaser has the expectation that the vehicle they are purchasing will be in excellent condition at the time and place of delivery and not fraught with defects, and, should a problem arise its dealers have the ability to effectively repair it. As reflected by its repair history, Mr. Hatfield's 500 Sport, and Fiat and its dealers have not met those expectations and assurances.

The use of this vehicle has been substantially impaired by its repeated failure to operate as designed or intended, the unreasonable number of times it has had to be returned attempting to have substantially the same defects in its material and workmanship corrected, the excessive number of days it has been out of service or had to be operated in a defective condition, and by difficulty obtaining satisfactory repairs from authorized Chrysler repair facilities.

With regards to a reasonable number of repair attempts, car manufacturers and consumers expect dealerships to correct issues on the first repair attempt with a "fix it right the first time" or similar mantra. This vehicle was not repaired in the number of repair attempts expected by a manufacturer or by a consumer, and in fact has never been repaired by Fiat's authorized dealers.

The value of this vehicle was been substantially impaired to Mr. Hatfield who never received the value of the Fiat Certified Pre-Owned vehicle and the warranties for which he paid. The vehicle he purchased

6

had already been subject to repair for the same problems that he experienced after he purchased it. The vehicle he received was not free from significant or recurrent defects or conditions, and corrective efforts made under Fiat's warranty were not made in a reasonable period of time or number of repair attempts. As of July 24, 2018, Mr. Hatfield was still waiting for a part to correct the evaporative emission system diagnostic trouble code and Check Engine light, and Fiat's dealer was refusing to make any further repairs to the moon roof. These are failures of FCA US LLC to honor its warranties. Furthermore, a vehicle with an illuminated Check Engine warning light fails a state administered emission inspection, making it ineligible to have a state safety inspection performed.

.  .  .  .

According to the "Kell[e]y Blue Book, there are 5 categories that describe the condition of a used vehicle: "Excellent, Very Good, Good, Fair, and Poor." One expects a new vehicle under warranty to be in "excellent" condition at the time and place of acceptance, and also expects that a used vehicle still under warranty would also be considered to be in excellent mechanical condition throughout the warranty period. A vehicle with significant or recurrent warranty defects could not be considered "excellent."

Considering this vehicle's history and Chrysler's substandard fulfillment of its warranties, I would categorize the condition of this vehicle at the time and place of [of] acceptance and during its warranty period as being between "fair" and poor conditions, with fair being described by KBB as having "cosmetic or mechanical problems and needs servicing," and poor being described as having problems that cannot be

readily corrected. This vehicle's repair history is consistent with those descriptions.

There is a 23.1 % difference between the value of this vehicle in Kelley Blue Book excellent condition and its value between fair and poor conditions. That 23.1% difference, deducted from the purchase payments, represents the difference in the value of this vehicle, as warranted (to be free from significant or recurrent defects or conditions) and as delivered, (with the defects and conditions described in its repair history). That amount is $2,917.

On June 7, 2018, two days after Turner completed his initial inspection, but several weeks before he submitted his report, defendant served plaintiff with discovery, including a "Request for Production of Documents Addressed to Plaintiff." The request included a demand for production of "[t]he subject vehicle and all components thereof, for purposes of non-destructive testing and examination of the vehicle by [defendant] or its representatives, to be produced at an appropriate time and place to accomplish said testing and examination." Defendant did not request a specific date or time to inspect the car until more than four months later, on October 19, 2018.

In September 2018—nearly three months after defendant served its discovery request and a month before defendant gave plaintiff a date for inspection of the Fiat—plaintiff again returned to the Dealership. The Fiat's check engine light was on and there was "blue smoke" coming from the tailpipe.

A-3194-18T2

Concerning the engine light, the Dealership's September 4, 2018 repair order states: "Cause[:] evap purge valve needed[.] Correction[:] part unavailable until 11/30/18 at the earliest." Concerning the blue smoke, Dealership personnel could not confirm there was any blue smoke, but changed the car's oil.

Three days later, defendant deposed plaintiff. When asked if the Fiat still had problems, plaintiff said the moonroof was still broken, and the Dealership "refused to warranty it again." When asked if he had immediate plans to sell the car, plaintiff responded he was considering a trade-in. Asked if he had taken any steps to do so, plaintiff told defendant's counsel he had gone to a dealership in Pennsylvania where he had been offered $4000. The deposition record does not disclose that defendant's counsel said anything about inspecting the car before plaintiff traded it in.

On September 18, 2018, the Fiat's check engine light came on again. Plaintiff returned to the Dealership, where he was informed the Fiat's turbo charger needed to be replaced but the required part was on national back order. In addition, due to his observation of blue smoke and low oil, he was required to return after he had driven 500 more miles so the Fiat's oil consumption could be checked. The Dealership would not provide him with a loaner until the part arrived.

Concerned about further damaging the Fiat by driving it with a defective turbo charger and "evap" purge valve, in need of transportation, and left with no other options, plaintiff sold the Fiat back to the Dealership. He received $4500, but due to the amount he originally financed and the balance he owed, he ended up paying $3061.23. The sellback occurred on October 1, 2018. Plaintiff averred he "did not intentionally destroy, alter, or lose the vehicle. To the contrary, [he] sold the vehicle so it would not be destroyed or altered by being driven with a defective turbo charger and evap purge valve."

On Friday, October 19, 2018, ten days before discovery ended, defense counsel's paralegal wrote an email to plaintiff's counsel's secretary at 4:00 p.m. with this request: "I would like to schedule plaintiff's vehicle inspection on October 29, 2018 at 12:45 p.m. at Fiat of Maple Shade. Please confirm this date and time as soon as possible." On Monday, October 22, 2018, in an email sent at 12:39 p.m., the secretary responded that she had just been made aware the vehicle "has been sold back to FIAT" and she attached supporting documents evidencing the car had been sold back to the Dealership. Four days later, on October 26, 2018, the Dealership sold the car to a third party. Defendant made no attempt to extend discovery or to locate the car.

## Defendant's Motion to Dismiss

On December 26, 2018, after the parties twice adjourned arbitration, defendant filed a "Notice of Motion to Dismiss" based on spoliation of evidence. Defendant did not support the motion with a certification from its expert or any evidence from its expert. Consequently, the court had no competent information about what the defense expert could or could not conclude from the documentary evidence generated by the Dealership and his presence at the inspection of the Fiat that had taken place.

During argument on the motion, the following exchange occurred between the court and plaintiff's attorney:

> [The Court]: What did you tell your client about maintaining the car for purposes of having the inspections?
>
> [Counsel]: I told my client that it was our very strong recommendation that he retain the vehicle throughout the discovery period and if, for some reason, he was unable to retain the vehicle, he should contact us so that we could give the defendant notice.
>
> [The Court]: All right. And did he contact you before selling the vehicle so you could give the defendant notice?
>
> [Counsel]: No, Your Honor. I did not get a direct phone call before he decided to do that. We were made aware at the deposition that he was considering it but I

11

did not get a phone call. I only got one after the vehicle had been sold.

[The Court]: All right. So he didn't abide by your . . . instructions?

[Counsel]: Unfortunately not, Your Honor.

Defense counsel represented to the court that the defense expert typically conducted his inspection of vehicles in such cases "at an automobile facility where there's a service bay available to do a thorough inspection." Counsel also told the court, "[t]ypically, our expert's test drives are longer so - - and, in my opinion, more - - just much more thorough than plaintiff's expert's inspection." After summarizing plaintiff's allegations, defense counsel added, "[s]o, there's certainly the allegation that the servicing dealer's repair attempts were unsuccessful but we have no way of defending that claim, Judge, because plaintiff deprived FCA the opportunity to inspect the vehicle." Counsel did not disclose to the court whether he was repeating what his expert said or merely advocating based on his experience with the expert in prior cases and his supposition about what the expert could or could not do in the present case.

The court granted defendant's motion to dismiss. In its oral opinion delivered from the bench following argument, the court found plaintiff "took it upon himself to deprive both counsel from really adequately representing their

clients and he directly violated his attorney's instructions." Finding plaintiff had left defendant "defenseless in this case," and reiterating "the plaintiff knew that he wasn't supposed to do it and he did it," the court dismissed the complaint with prejudice.

The trial court denied plaintiff's motion for reconsideration. This appeal followed.

## II.

Because we are reviewing the trial court's application of legal consequences that flow from mostly undisputed facts, our review is de novo. See Manalapan Realty, L.P. v. Twp. Comm., 140 N.J. 366, 378 (1995) ("A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference."). Our analysis is informed by fundamental principles surrounding motion practice. Motions "based on facts not appearing of record or not judicially noticeable" may be presented "on affidavits made on personal knowledge, setting forth only facts which are admissible in evidence to which the affiant is competent to testify." R. 1:6-6. "Affidavits by attorneys of facts not based on their personal knowledge but related to them by and within the primary knowledge of their clients

13

constitute objectionable hearsay."  Pressler and Verniero, <u>Current N.J. Court Rules</u>, cmt. on <u>R.</u> 1:6-6 (2020).

We also consider the interplay between these principles and those concerning spoliation.  The term spoliation, "as its name implies, is an act that spoils, impairs or taints the value or usefulness of a thing."  <u>Rosenblit v. Zimmerman</u>, 166 N.J. 391, 400 (2001) (citing <u>Black's Law Dictionary</u> 1409 (7th ed.1999)).  Spoliation occurs when a party, usually an adverse party, hides or destroys "litigation evidence."  <u>Id.</u> at 400-01.  Remedies for spoliation include discovery sanctions and adverse inferences, <u>Robertet Flavors, Inc. v. Tri-Form Constr., Inc.</u>, 203 N.J. 252, 272 (2010), and in some instances "a separate tort action against the spoliator."  <u>Rosenblit</u>, 166 N.J. at 403.

When selecting an appropriate remedy, courts must be guided by the goals served by such remedies: "to make whole, as nearly as possible, the litigant whose cause of action has been impaired by the absence of crucial evidence; to punish the wrongdoer; and to deter others from such conduct."  <u>Robertet Flavors, Inc.</u>, 203 N.J. at 273 (quoting <u>Rosenblit</u>, 166 N.J. at 401).  In considering the extent to which a party has been prejudiced by spoliation, courts "should also recognize that the non-spoliating party may bear some of the responsibility for the loss of the evidence."  <u>Id.</u> at 281.

Courts must also consider the time the spoliation is discovered. Id. at 273. "Spoliation that becomes apparent during discovery or trial often can be addressed effectively through the use of ordinary discovery sanctions, such as preclusion, or through adverse inferences." Ibid. (citing Rosenblit, 166 N.J. at 401-02).

The Supreme Court's "admonition concerning the circumstances in which the harsh and draconian remedy of dismissal may be used" is another consideration. Id. at 274. Dismissal "will normally be ordered only when no lesser sanction will suffice to erase the prejudice suffered by the non-delinquent party." Ibid. (quoting Zaccardi v. Becker, 88 N.J. 245, 253 (1982)).

Guided by these principles, we conclude the trial court's order dismissing the complaint must be vacated. The trial court concluded plaintiff deliberately spoliated evidence and thereby deprived defendant of the opportunity to obtain an expert's opinion and present it at trial. But the court's conclusion concerning plaintiff's state of mind was based on inferences derived from information obtained in violation of the attorney-client privilege. In addition, the court's conclusion concerning defendant's inability to obtain an expert opinion was unsupported by competent evidence on the motion record.

A-3194-18T2

Communications between lawyers and their clients, in the course of their relationship, made in professional confidence, are privileged. N.J.S.A. 2A:84A-20; N.J.R.E. 504. There are exceptions, but not one of the exceptions identified in the rule is asserted here. There is no blanket exception for judicial inquiries. "The privilege shall be claimed by the lawyer unless otherwise instructed by the client or [the client's] representative[.]" N.J.S.A. 2A:84A-20; N.J.R.E. 504. Here, neither the court nor plaintiff's counsel apparently gave any consideration to the privilege. Counsel's response to the court's question about advice she gave plaintiff became a major argument point for defense counsel and formed a significant part of the basis for the court's opinion dismissing the case.

The court's conclusion about plaintiff's deliberate spoliation in selling the Fiat back to the authorized dealer from whom he purchased it is also questionable. In making the finding, the court did not comment on plaintiff's disclosure at his deposition, to defense counsel, that he had taken steps to trade in the Fiat. The court had no information about when plaintiff's counsel told plaintiff to preserve the Fiat, whether plaintiff believed defendant's expert had inspected the car at the same time plaintiff's expert had inspected it, or whether plaintiff might have considered that defendant had access to the Fiat through its authorized dealership, from whom plaintiff purchased it, and to whom he

eventually resold it. Indeed, plaintiff certified he sold the Fiat back, at a considerable loss, because he needed transportation and did not want to damage it by driving it in a condition the Dealership could not repair.

We need not decide, however, whether violation of the attorney-client privilege would, without more, be grounds for reversing the court's decision. The court's conclusion that the defense expert could not render an opinion was based on nothing the expert said, but rather on statements made by defense counsel during oral argument on the motion, which are hardly competent evidence. The defense expert, who was present when plaintiff's expert inspected the Fiat, provided no information as to whether he could or could not render an opinion.

It is not insignificant that the defense expert was present for the inspection of the Fiat. Nor is it insignificant that the defense expert had access to all the information plaintiff's expert relied upon in formulating his expert opinion. These considerations raise an obvious question: why was the defense expert unable to render an opinion based on the same data that served as the foundation for plaintiff's expert's opinion?

The trial court not only overlooked these considerations, but also apparently overlooked plaintiff's theory of liability. Plaintiff's theory of

17

liability, based on his expert's opinion, was the Dealership failed to remedy the mechanical problems with the car, within a reasonable time, after having multiple opportunities to do so. The court never questioned why the defense expert could not have rendered an opinion based on the available information and his presence at the inspection, or how, if at all, defendant's expert's "inspection" of the Fiat at the Dealership would have undermined plaintiff's expert's opinion.

Nor did the court give due consideration to whether defendant contributed in any way to the alleged spoliation by waiting until the last extended discovery end date to inspect the Fiat and by failing to notify the Dealership not to resell the Fiat after learning plaintiff had resold it to the Dealership. Perhaps most important, the trial court gave little or no consideration to whether spoliation had occurred.

The Dealership resold the Fiat and presumably could identify the name and address of the purchaser. Defendant made no effort to determine through the Dealership whether the Fiat remained in New Jersey or whether the owner could or would voluntarily produce it for inspection.

The trial court's oversights are significant, particularly in view of the Supreme Court's admonition that the ultimate sanction of dismissal with

18

prejudice should be a remedy of last resort. The imposition of that sanction in this case was grounded on incompetent evidence and unsupported suppositions. Accordingly, the trial court's order of dismissal is vacated, and the matter is remanded for further proceedings consistent with this opinion.

Vacated and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3194-18T2